## DIETZEL *v.* STATE.

## (*Jackson.*   April Term, 1915.)

1. **INDICTMENT AND INFORMATION.   Names of witnesses.   Indorsement.   Statute.**

Under Shannon's Code, sec. 7054, requiring the foreman of the grand jury to indorse on the indictment the names of witnesses sworn by him, but that the omission to indorse shall in no case invalidate the indictment if the witnesses were actually sworn according to law, where the plea in abatement, to an indictment for murder, for failure to indorse thereon the names of witnesses examined by the grand jury, disclosed that the witnesses were sworn in fact, the indictment was not invalid.   (*Post, p.* 67.)

Acts cited and construed: Acts 1875, ch. 30.

Code cited and construed:   Secs. 7054, 7057 (S.).

2. **CRIMINAL LAW.   Plea in abatement.   Late filing.**

Where an indictment for murder in the first degree was returned September 9th, and the court remained in session from day to day until September 21st, when a plea in abatement to such indictment set up that names of witnesses before the grand jury were not indorsed thereon as required by statute, the plea came too late, since such pleas are not favored and must be filed at the first opportunity.   (*Post, p.* 69.)

Cases cited and approved:   Ransom v. State, 116 Tenn., 363; Rivers v. State, 117 Tenn., 240; Pennell v. State, 122 Tenn., 628; Chairs v. State, 124 Tenn., 632; Ashby v. State, 124 Tenn., 693.

3. **CRIMINAL LAW.   Appeal and error.   Harmless error.   Exclusion of evidence.**

In a prosecution for murder, where, to establish an alibi, defendant's sister testified that she had seen him come home at a certain hour, and, to corroborate such sister, her lover gave certain testimony as to her having been slightly late to an appointment with him, such lateness, according to the sister's testi-

mony, having been because she could not leave the house, as she did not wish her brother, the defendant, who had just returned, to see her, the exclusion of the lover's testimony that the girl had told him she was late because her brother was in the house was harmless, where, from testimony admitted, it must have been apparent to the jury that such was the explanation that the witness would have testified she gave him. (*Post, p.* 69.)

Case cited and distinguished: Legere v. State, 111 Tenn., 368.

Cases cited and approved: Hays v. Cheatham, 74 Tenn., 2; Dossett v. Miller, 35 Tenn., 76; Queener v. Morrow, 41 Tenn., 123; Third Nat. Bank v. Robinson, 60 Tenn., 479.

4. **WITNESSES. Corroboration. Previous consistent statements.**
In a prosecution for murder, where the State made no effort to impeach, by evidence of former contradictory statements, the testimony of defendant's sister that she had been delayed in keeping an appointment with her lover on account of the return of defendant to the house at a certain hour, which tended to establish an alibi, testimony of the lover himself as to what explanation the sister gave him of her lateness was properly excluded, since proof of prior consistent statements to corroborate a witness is inadmissible, unless the witness is impeached. (*Post, p.* 69.)

5. **CRIMINAL LAW. Evidence. Res Gestae.**
In a prosecution for murder, where an alibi was sought to be established by the testimony of defendant's sister that she was late in keeping an appointment with her lover because she could not leave the house on account of defendant's return at a certain hour, evidence of the lover that when she met him she gave him such reason for her lateness was not admissible as part of the *res gestae.* (*Post, p.* 73.)

6. **CRIMINAL LAW. Circumstantial evidence. Instructions. Degree of proof.**
In a prosecution for murder, where the court charged that, if certain facts were found to be true beyond a reasonable doubt,

Dietzel v. State.

then defendant was guilty of murder in the first degree, followed by an instruction that, where circumstances alone are relied upon to convict, the proof must be so cogent, powerful, and well connected as to satisfy beyond a reasonable doubt of defendant's guilt, and to exclude every other reasonable hypothesis, such instructions, taken together, were correct upon the point of the degree of.certainty of proof required for conviction. (*Post, p.* 73.)

7. **CRIMINAL LAW. Alibi. Sufficiency of evidence.**
In a prosecution for murder, evidence *held* insufficient to establish an alibi. (*Post, p.* 75.)

8. **HOMICIDE. Motive. Sufficiency of evidence.**
In a prosecution for murder, evidence *held* sufficient to establish a motive. (*Post, p.* 75.)

9. **HOMICIDE. Guilt. Sufficiency of evidence.**
In a prosecution for murder, circumstantial evidence *held* sufficient to show defendant's guilt as excluding every other reasonable hypothesis. (*Post, p.* 76.)

---

FROM OBION.

---

Appeal from the Circuit Court of Obion County.— Jos. E. Jones, Judge.

Pierce & Fry, J. A. Whipple and J. M. Anderson, for plaintiff in error.

Frank M. Thompson, Attorney-General, for the State.

Mr. Justice Green delivered the opinion of the Court.

132Tenn.4

Plaintiff in error was indicted and charged with the murder of George Wehman on July 11, 1914. He was tried and found guilty of murder in the first degree, with mitigating circumstances. The trial judge disregarded the finding of mitigating circumstances and imposed the death penalty, and Dietzel has appealed in error to this court.

The deceased, George Wehman, was a man about fifty-five years of age. He disappeared from his home in Union City on the night of July 11, 1914. Foul play was suspected, and a search was instituted for him. On July 24, 1914, his body was found in a well some two or three miles west of Union City. There was a gunshot wound on the back of his head, by which the doctors testified his death was produced.

Deceased was formerly a barber, but of late years had become a painter. He also appears to have done odd jobs of every kind around Union City, and was an individual of eccentric habits. He had separated from his wife and boarded at the house of a Mrs. Dunn, at the east end of Church street, in Union City. Deceased was miserly in his habits, and testimony in the record indicates that it was a custom of his to carry money on his person, and that this was generally known. Some three or four years before his death he went to a friend of his in Union City and took from his pockets $2,500 in currency, which he turned over to this friend for safekeeping. A short while before his death the same friend, Mr. Burdick, saw deceased with about $140 on his person.

Dietzel v. State.

Wehman carried his money in a red tobacco sack, and he was seen in possession of this sack and to take a roll therefrom by his landlady on the night he was killed, and by a merchant a few days previous thereto. Mrs. Dunn, his landlady, testifies that he was in the habit of counting his money. The deceased had very little to do with other people; and with the exception of Mr. Burdick, heretofore referred to, and one other man in Union City, he was not known to have had any intimate associates.

Plaintiff in error is a young man who has about attained his majority. His home was in Union City, with his father, Herman Dietzel, who appears to be a man of substance and is highly respected in the community. Mr. Dietzel testifies that he started in life as a blacksmith, and, as said before, the record indicates that he has accumulated considerable property. Plaintiff in error has two brothers, who are men of standing, and two young lady sisters. The Dietzels live in a comfortable home in Union City.

Notwithstanding the disparity of age between plaintiff in error and the deceased, and notwithstanding the difference in their social positions and walk of life, plaintiff in error seems to have sought the company of deceased. It is in evidence that these two were together at the town of Rives a few days before the disappearance of deceased. They drove over there from Union City in a buggy and had supper at a restaurant in Rives and tried to get something to drink.

It appears from the testimony of Mrs. Dunn and of her husband that deceased returned from his work on the night of July 11th about eight o'clock. He went to a hydrant in the yard and washed the paint off his hands with a brush, which he kept for that purpose. Then, going into the house, he paid Mrs. Dunn his week's board; this being Saturday night. She stated that he took two sacks from his pocket, one of which contained a roll of bills, and another contained silver money; that he had all his money out on the table, counting it, and paid her five silver dollars, and returned his roll of bills to the red sack. There is an apparent conflict between Mr. and Mrs. Dunn's testimony as to whether the deceased had his money in one sack or two, as Mr. Dunn recollects that there was only one sack. Mrs. Dunn, however, was in the room with deceased, while her husband was outside, and her opportunities for observing were better. This conflict is immaterial, however, for it is distinctly shown by another witness, a merchant in Union City, from whom deceased bought paint, that the latter did carry his currency in a red tobacco sack.

It was the habit of Wehman to take a bath every Saturday night under a hydrant at a livery stable in Union City. In company with Mr. Dunn, deceased left his boarding house about nine o'clock to go to town for the purpose of taking this weekly bath. The two went west on Church street up to the business portion of the town, where they separated, with the under-

standing that they were to meet again at Alexander's livery stable at 10:30 p. m. and go home.

Much proof was introduced on the trial as to the respective whereabouts of the deceased and plaintiff in error during the early part of this night of July 11th. We do not find it necessary to review this testimony in detail. As to the deceased, it is sufficient to say that he was seen by a number of persons around the corner of Church street and First street, which appears to be the business center of Union City, at nine o'clock or thereabouts, and that he was seen to go to Corum's livery stable, where he took his bath, and which place he left about ten o'clock. Corum's livery stable is on First street, and fronts to the east. Opposite this stable is a marble yard, and in the rear of the marble yard is Depot street. Then going east there is a park, through which the deceased would naturally have passed on his way home from the livery stable. He was seen to leave the livery stable as though he intended to pass through the marble yard, and he was seen by other witnesses on east Church street, within about three blocks of his boarding house. These witnesses place the time that they saw him at about 10:22 p. m. A gentleman who saw him at the last named point was returning from a picture show and noticed that it was 10:12 by a clock on a store uptown as he passed. He estimates that it took him ten minutes to walk from this store to the place where he saw the deceased. Two ladies met Wehman near this place, and their testimony may be construed as in-

dicating the time to have been about 10:20. They had
been out visiting, and were on their way home. They
had left a neighbor's house in the immediate vicinity,
but were not sure whether it was a quarter of ten or a
quarter after ten when they made their departure.

When seen at this last-named point, the deceased
was standing still, off the edge of the sidewalk. The
State insists that he was waiting for some one. Plain-
tiff below undertook to show that it was a habit of de-
ceased to step off the sidewalk when he was about to
meet ladies. He was not seen by any one, who testi-
fies in the record, after these witnesses saw him as just
related, at 10:22 p. m., July 11th, until his body was
discovered in the well.

Plaintiff in error was also uptown on Saturday night
between nine and ten o'clock. He was seen by a num-
ber of persons in the business portion of the city. He
bought a pair of socks at a toggery shop about 9:30,
and was seen by another witness at the corner of
Church street and First street about ten o'clock, and
other witnesses saw him nearer his home and walking
as though he were going home at about 10:15 p. m.
The testimony of witness Raleigh Dodson, who testi-
fied to seeing plaintiff in error within a short distance
of his home at about 10:15, is somewhat weakened by
the State on cross-examination. The home of plaintiff
in error was on east Main street, two blocks north of
Church street. The Dunn house, where Wehman
boarded, was on east Church street, and leaving the
business portion of the city, plaintiff in error would

pursue the same general direction on his way home that deceased would take to his boarding house.

Leading out from Union City in a westwardly direction are two main roads, known as the Protemus road and the Rockbridge road. The Protemus road is north of the Rockbridge road. Something less than three miles from the corporate limits these two roads, still pursuing the same direction, are connected by a lane or crossroad. About 500 or 600 yards south of the intersection of this lane and the Protemus road was the well in which the body of deceased was found.

The brother of deceased measured the distance from this well to the Dunn house by the speedometer on his automobile, and testified that the distance from the Dunn house to this well by the Protemus road was 3.1 miles, and by the Rockbridge road 3.3 miles.

The theory of the State was that the plaintiff in error took the deceased from Union City to the well referred to in a buggy on the night of July 11th and killed him somewhere on the way and placed his body in the well, returning to town about 11:30. In view of the foregoing testimony as to the whereabouts of the parties on this night, it is urged in behalf of plaintiff in error that it was a physical impossibility for him to have committed the crime in the manner charged.

It is established beyond controversy in the record that Frank Dietzel procured a horse and buggy from Alexander's livery stable on the night of July 11th, and that he left the stable in this rig at about nine o'clock. He was driving a gentle mare, which the liveryman

calls the Edwards mare, and she was hitched to a no-top buggy.

This horse and buggy was returned to the stable at 11:30. The time is fixed very satisfactorily by employees of the livery stable. These employees were in the rear of the stable and did not see who brought the rig in. The person bringing the rig hallooed, left it in front of the stable, and departed immediately. The horse driven, when brought in, was hot, excited, and, as one of the witnesses said, "she was scared to death." This witness further said that he had never seen the mare in such a condition before; that she was very gentle; and that a child could handle her.

In this connection we may dispose of the contention made in behalf of plaintiff in error that it was impossible for him to have driven out to the well and back, killing Wehman, and placing him in the well, within the time the testimony shows he could have had for that purpose. The deceased and plaintiff in error were last seen in the same part of town, as heretofore noted, at 10:20 and 10:15, respectively. They could have gotten together in a very few minutes, and the plaintiff in error still have had more than one hour to drive to the well, commit the crime, and return by 11:30.

'Squire Bratton, who lives on the Protemus road, where it is intersected by the lane referred to, says that he has timed himself and frequently driven from the well in which the body of deceased was found to Union City by the Protemus road in seventeen or eighteen minutes, and that he has traveled from this

·well to town by the Rockbridge road in twenty-five or thirty minutes. He stated that he could do this traveling at an average gait.

Dr. Roberts took this same mare which plaintiff in error had on the night of July 11th and drove from Alexander's stable to the well in sixteen and one-half minutes by the Protemus road and from the well to the stable in twenty-three and one-half minutes by the Rockbridge road. He too said that he drove this distance at an average gait.

So it appears that the round trip between Alexander's stable and the well may be readily made in from thirty-three to thirty-six minutes by the Protemus road, and within forty-seven minutes to an hour by the Rockbridge road.

The testimony as to the mare's condition shows that she was very hot and tired when returned to the stable on this night, and that she must have been driven very rapidly. Other testimony indicates that plaintiff in error returned by the Protemus road, the shorter route.

A witness named Logan, driving out the Protemus road, when near about halfway between the town and 'Squire Bratton's, met a man returning to Union City in a no-top buggy. Logan spoke to this man, but the latter did not reply, and Logan noticed that, although it was a very hot night, the man was covered up, head and all, with a tarpaulin or lap rug. The night was hot, and the covering could only have been used by the individual Logan met for the purpose of concealing his identity.

So we think that, by driving rapidly and using the Protemus road one way even, plaintiff in error would have had ample time to take the deceased out to this locality, kill him, and put his body in the well. The well was only a few feet from the lane.

It appears from the record that, in addition to the body of the deceased, there were found in this well a towel, a cake of soap, and a brush. These articles were no doubt taken by Wehman with him to the livery stable to be used in bathing, and the fact that they were found with him indicates that he had not returned home, but was picked up somewhere between the stable and Mrs. Dunn's residence. The proof shows that it would have been possible to have gotten out of Union City to this well by either route and avoided passing through lighted streets. Union City is not a large town, and the deceased and plaintiff in error might have started from one point as well as another within the town and reached the well in very nearly the same time.

After this buggy was returned to the livery stable, there was found in it a bloody lap rug. This proposition is controverted by the plaintiff in error, but we think the evidence shows it to be true. The liveryman had two buggies exactly alike. On the night of July 11th, one was let out to plaintiff in error and the other to a young man named Kimsy. The employees of the stable testified that Kimsy had no rug in his buggy. Kimsy is of the same opinion himself. He is not sure, but does not recall having a rug. The employee who

hitched up Dietzel's buggy swears positively that he gave Dietzel a lap rug when the latter started out.

On the morning of July 12th, when these two buggies were cleaned, this bloody lap rug was found in one of them. The witness first said that he did not know whether it was in the Dietzel buggy or the Kimsy buggy, as the buggies were twins. On reflection, however, he stated that it was bound to have come out of the Dietzel buggy, because Kimsy had no lap rug on the night before. Kimsy also testifies that, if there had been a lap rug in his buggy, there was no possible way in which it could have gotten bloody. He had taken a young lady driving. The blood on the lap rug referred to had not dried on the morning of the 12th, when it was discovered. The lap rug is filed as evidence in the case.

On the next day after the disappearance of Wehman, the plaintiff in error went to the Elk's Club in Union City, of which he was a member. His dues were more than six months in arrears, amounting to $12. The secretary of the club testified that these dues were paid by plaintiff in error on July 12, 1914.

On the same day plaintiff in error wrote a letter, which is in the record, to a sister-in-law, and inclosed her $15 on account of an indebtedness that she held against him, and promised to send her more later in the week.

Within two or three days thereafter plaintiff in error called at a tailor's in Union City, named Sutherland, and paid him for a pair of pants which he had

ordered the week before.   This payment was made before the pants were finished.

When the body of deceased was examined, the red tobacco sack in which he carried his roll of currency was missing.   There was found on his person the other sack in which he had silver.

A few days prior to his disappearance, deceased paid to Mr. Burdick a $10 bill in settlement of some transaction between them, possibly a loan made by Mr. Burdick.   This bill paid to Mr. Burdick by the deceased was a national bank note on the Third National Bank of Union City, No. H826561A.   The bill had a hole in it, was much worn, and was stained from contact with some red substance.   Mr. Burdick gave this bill to his son, who put it in the cash drawer.   The son testified positively that he did not pay this bill out.   He said that it was old and worn, and he disliked to put it in circulation.   He says that at the end of the week he gave it to his mother; it being his custom to give his mother money from time to time.   Mrs. Burdick preserved this bill, and it was introduced as evidence in this case.

When the plaintiff in error paid Mr. Sutherland for the pants, he gave him a gold certificate for $10, and Mr. Sutherland gave him back $2 in change.   Mr. Sutherland put this bill in his cash drawer, where he kept it a few days, and then deposited it in the Third National Bank of Union City.   On the same day that Mr. Sutherland made this deposit, Mr. Burdick, who was on the lookout for discolored bills stained with red, pro-

cured the one deposited by Mr. Sutherland from the bank, and it is also in evidence. It is a gold certificate, No. B400669084.

This bill was shown to Mr. Sutherland on the trial of the case, and he was asked if it was not the bill which Dietzel paid to him. He replied:

"That one he gave me was very much like that, possibly the same."

Mr. Sutherland was asked this question:

"You do not know this $10 gold certificate from any other, do you?" Answer: "I do not recall having seen one just like that."

He was again asked:

"You do not know whether this is the same bill you deposited in the bank, do you?" Answer: "To the best of my ability, it is, but I do not know."

The deposit made by Mr. Sutherland in the bank amounted to only $55; and while he says that he will not be positive that the $10 bill in evidence was the one he received from plaintiff in error, because he did not take the number, to the best of his knowledge he thinks it is the same bill. He said that he did not recall having seen any other bill just like that one.

Now comparing the bill introduced by Mr. Burdick, which clearly came from the roll of the deceased, and the Sutherland bill, we find them both stained red, as if from contact with a red tobacco sack. We find them both much worn and raveled along one edge in very much the same manner. At the top of both bills in the right-hand corner is an irregular tear; the tear in the

two bills corresponding almost exactly. It is extremely probable that they were carried in the same roll and torn at the same time.

It further appears that the secretary of the Elk's Club deposited the $10 bill received by him from Dietzel in the Third National Bank of Union City, and a $10 bill was recovered from the Third National Bank and introduced in evidence in this case, and it is likewise stained red.

A number of bills were introduced by defendant below collected from the bank, which were also stained red, and there is proof to the effect that a red stain is a common thing on paper money.

However, no two bills are offered in evidence which bear the striking resemblance to each other that exists between the Sutherland $10 bill and the $10 bill which Burdick received from Wehman.

Some days after the disappearance of George Wehman, when search was being made for his body, acting under instruction of the district attorney-general, a witness named Stephens started out to examine the wells in the neighborhood of Union City. Frank Dietzel went with Stephens. Stephens appears to have taken him because of Dietzel's familiarity with the section of country through which they traveled. They went out the Protemus road, turned down the lane heretofore mentioned, went through it, and came back by the Rockbridge road. Dietzel was familiar with this locality. His father had formerly owned the farm now owned by 'Squire Bratton, at the intersection of the

Dietzel v. State.

lane and the Protemus road.  Along this lane were
three wells, one on the east side and two on the west
side.  All of them were close to the lane, and in one
of them the body of deceased was afterwards discov-
ered.

When Dietzel and Stephens went out on this search,
two wells were examined on the Protemus road, and two
wells were examined coming back on the Rockbridge
road.  All of these wells were examined at the sugges-
tion of Dietzel, except one.   He pointed them out.
Stephens was not acquainted in this locality.  In pass-
ing through the lane, however, through this country,
in which the proof shows he had been hunting for
years, and with which he was  thoroughly familiar,
Dietzel did not look into any of the three wells along
the lane, nor did he tell Stephens of their existence.

On the morning after the disappearance of Wehman,
plaintiff in error was seen driving through this lane.
He was there again on July 13th, about dusk.  He was
also in this neighborhood about eleven or twelve o'clock
at night on July 13, 1914.  He was seen there again
late Wednesday evening in the lane, coming from the
direction of the well.  Between Wednesday and the
time of the discovery of deceased's body, plaintiff in
error was seen in this lane two or three other times.
On all these occasions he was alone, and was there
without any apparent object.

There is only one witness in the record who under-
took to testify that he saw deceased and plaintiff in
error together on the night of the former's disappear-

ance.   This witness stated that he saw them sitting on
the steps of the C. B. A. Building, at the corner of
Church street and First street.   He said that Dietzel
spoke to him, and that the man with Dietzel looked to
the witness like George Wehman.   He admits, how-
ever, that Dietzel's companion had his hat pulled
down over his face, and witness could not be
absolutely certain that the man was George Weh-
man.   This, though, is immaterial.   A number of
witnesses saw both these parties on First street, near
the corner of Church street, between nine and ten
o'clock, and the two had abundant opportunities to meet
and arrange for the trip to the country later in the
night if such arrangement had not been previously
made.

Plaintiff in error rests his defense largely upon an
alibi endeavored to be established for him by members
of his family.   His father and mother and his two sis-
ters were at home that night.   They lived in a two-
story house; the father and mother occupying a front
room downstairs, and the two sisters a room upstairs
immediately over their parents.   The room of plaintiff
in error was upstairs across a hall from his sisters'
room.

Herman Dietzel, the father, testified that he and his
wife sat up on the night of July 11th until ten o'clock.
They then began their preparations for retiring, and
got to bed about 10:15.   Mr. Dietzel states that, shortly
after he went to bed, plaintiff in error entered the
house and came to the door connecting the father's

bedroom with the front hall, and told his father that a Mr. Cockrill had died ·that night at the hospital. Dietzel, Sr., said that plaintiff in error stood at the door talking to him for about one minute, and then went upstairs to his room.

Mrs. Dietzel testified to the same effect as her husband.

Miss Nellie Dietzel, the younger sister of plaintiff in error, about nineteen years of age, testified that she and her sister Minnie retired about the same time that their parents did. She said that her sister immediately went to sleep, but that she remained awake. It appeared from her testimony that she had a sweetheart, named Marshall Wright, and that she had made an engagement to meet him in a grape arbor on the Dietzel premises that night at eleven o'clock. Marshall Wright had been forbidden by her parents to call on her, and she was not able to see him, except in a clandestine manner.

So she stated that she undressed and went to bed and pretended to be asleep. She said that, while lying in bed, at about 10:30 her brother Frank came in and went to his room. According to her statement she had her watch with her and noticed the time in order to be sure of keeping her engagement with Marshall Wright at eleven o'clock. Her testimony is that her brother went to his room, turned on the light, and began to read and in a few minutes went back to the bathroom. When he went into the bathroom she then saw an opportunity to get out without attracting his attention, so

132Tenn.5

she slipped past the bathroom into an upstairs room
in the rear of the house. She said that she remained
concealed in this room until her brother left the bath-
room, and she then came downstairs and went out to
the grape arbor, where she found her sweetheart wait-
ing. She testified that she told Marshall Wright when
she got there that she was afraid she would be unable
to get out on account of her brother Frank's presence,
and that she got to the arbor about three minutes late;
that is, about three minutes after eleven o'clock. She
stated that she remained with Marshall Wright about
one hour; that she noticed a light in her brother's
room; and that it continued to burn for thirty minutes
or more.

Marshall Wright was introduced for the defendant,
and corroborated the testimony of the young lady as
to her engagement with him and as to her being a little
late. He stated that he noticed a light in Frank's room
when he got there, but did not observe how long it con-
tinued to burn. He further stated that Miss Nellie
explained to him why she was late. He was not per-
mitted, however, to tell the jury what her explanation
was, and the exclusion of this evidence by the court is
made the basis of an assignment of error, which will be
hereafter referred to.

It was pointed out by the attorney-general in argu-
ment that, if events transpired in the manner detailed
by this young lady on the stand, she must have gone
out in her nightclothes to meet her sweetheart, a cir-
cumstance which is altogether improbable and tends

Dietzel v. State.

to weaken her entire testimony.   The attorney-general
gathered from the young lady's statements that she
had undressed and gone to bed, and that she left the
bed immediately upon her brother's going to the bath-
room, passed then to the unoccupied room in the rear
of the house, and immediately upon her brother's leav-
ing the bathroom she went downstairs.    She stated
that she had fully undressed in order to avoid arous-
ing any suspicion on the part of her sister, and it is
argued that she had no time or opportunity to put on
clothes before going out, if everything happened just
as she related it.

The foregoing constitutes a summary of the impor-
tant facts in the case.   We will return to the consid-
eration of these facts again in passing on the assign-
ments of error which challenge the sufficiency of the
evidence to sustain the verdict of the jury.

Passing now to the errors of law, it is contended
on behalf of plaintiff in error that the trial judge im-
properly struck from the files a plea in abatement
which challenged the regularity of the indictment filed
in this case.

The point made on the indictment is that the names
of the witnesses examined by the grand jury, upon
whose testimony the indictment was founded, are not
indorsed on the back thereof.   Plaintiff in error relies
on section 7057 of Shannon's Code, as follows:

"Witnesses Indorsed.—When presentment is made
upon evidence of witnesses sent for by the grand jury,
the names of the material witnesses for the State, ex-

amined before the grand jury, shall in all cases be indorsed thereon before it is presented to the court.''

The trial judge held that the plea in abatement was not sufficient, and furthermore that it came too late.

The section of the Code quoted is taken from the act of 1823. This act on its face applied only to presentments and not to indictments. By chapter 30, Acts of 1875, carried into Shannon's Code at section 7054, it is provided as follows:

''It shall be the duty of the foreman of the grand jury to indorse on the indictment, or, if it be a presentment, on the subpoena, the names of the witnesses so sworn by him, and sign the same officially, and the omission to indorse the same on the indictment or subpoena shall in no case invalidate the finding of the indictment or presentment, if the witnesses were, in point of fact, sworn by him according to law.''

In so far as section 7057 provides that the names of the witnesses shall be indorsed upon a presentment, it is repealed or modified by a later act (section 7054), which provides that, when a presentment is returned, the names of the witnesses shall be indorsed on the subpoena. The provision that the names of the witnesses shall be indorsed on an indictment is found in our law the first time in section 7054, Shannon's Code, chapter 30 of the Acts of 1875, a statute which in terms enacts that the omission to so indorse the indictment shall not invalidate the indictment ''if the witnesses were in point of fact sworn . . . according to law.''

The plea in abatement itself discloses that the witnesses were sworn before the grand jury. So we must hold by reason of section 7054, Shannon's Code, that the indictment found was not invalidated by the failure to indorse thereupon the names of the witnesses examined, inasmuch as it is made to appear that these witnesses were in point of fact sworn according to law.

Moreover, the trial judge was right in holding that this plea in abatement came too late. The defendant below was arrested and committed to jail on July 24, 1914. Court met, and the grand jury was impaneled September 7, 1914. The indictment herein was returned September 9, 1914, and the court remained in session from day to day until September 21, 1914, when the plea in abatement was filed; that is to say, the plea in abatement was not filed until twelve days after the indictment was returned. It came too late. The law is well settled to this effect. Such pleas are not favored and must be filed at the very first opportunity open to a defendant. *Ransom* v. *State,* 116 Tenn., 363, 96 S. W., 953; *Rivers* v. *State,* 117 Tenn., 240, 96 S. W., 956; *Pennel* v. *State,* 122 Tenn., 628, 125 S. W., 445; *Chairs* v. *State,* 124 Tenn., 632, 139 S. W., 711; *Ashby* v. *State,* 124 Tenn., 693, 139 S. W., 872.

Another assignment is predicated on the action of the court in excluding certain testimony of Marshall Wright, to which we have heretofore adverted.

Wright was called by the defendant below and permitted to testify that he came into Union City on the night of July 11, 1914, called up Miss Nellie Dietzel

over the telephone, and made an engagement to meet her at eleven p. m. in the grape arbor. He was further permitted to testify that he reached the trysting place a few minutes before eleven o'clock; that he heard the town clock strike eleven; and that Miss Nellie arrived in a few minutes afterwards. He stated that he saw a light in the bathroom, which was turned out in about five minutes; that Miss Nellie came down just after the light in the bathroom was turned out; and that a light in the southeast upstairs room of the residence (otherwise shown to have been Frank Dietzel's room) was turned on a few minutes after he reached the premises, and that this light remained on until after Miss Nellie came to the arbor. He was then asked if Miss Nellie made any explanation as to why she was late, and he said that she did; but the court did not permit him to state what this explanation was in the presence of the jury. Speaking to the stenographer, witness said that Miss Nellie told him:

"She said the reason she did not come down on time was that Frank was in the bathroom. He was up there, and she couldn't (come) down while he was in the way, so she could not get down, as he was where he could hear her."

The jury must have been dense indeed if they did not infer, from the testimony Wright was allowed to give, what Miss Nellie's explanation was as to the cause of her delay. His testimony showed that there was a light in Frank Dietzel's room; that the bathroom was lit up for about five minutes; and that, im-

mediately after the light in the bathroom was turned out, the young lady arrived, and that Frank Dietzel's bedroom light still remained on after Miss Nellie came down. It must have been obvious that the explanation she gave was that Frank delayed her arrival. So we think the exclusion of the testimony quoted could not have done the plaintiff in error any particular harm. The witness Wright was allowed to corroborate Miss Nellie Dietzel in practically every detail of her testimony.

Aside from this, however, we hardly think the explanation made by the young lady to Marshall Wright was competent.

The general rule undoubtedly is, where evidence of contradictory statements is offered to impeach the credit of a witness, testimony that on former occasions the witness made statements sustaining those made by him on the stand is inadmissible.

This court undertook to state the exceptions to this rule in *Legere* v. *State,* 111 Tennessee, 368, 373, 77 S. W., 1059, 1060, 102 Am. St. Rep., 781. The court there said:

"So it may be said it is now established in this country that where it is charged that the testimony of the witness is a recent fabrication, and is the result of some relation to the party or cause, or of some motive of personal interest, it may be supported by showing he had made a similar statement before that motive or relation existed."

See, also, *Hayes* v. *Cheatham,* 6 Lea, 2; *Dossett* v.

*Miller,* 3 Sneed, 76; *Queener* v. *Morrow,* 1 Cold., 123; *Third National Bank* v. *Robinson,* 1 Baxt., 479.

The material portion of the young lady's testimony was that indicating that Frank Dietzel was at home on the night of July 11th. There was no real effort made by the State to impeach this testimony by any evidence of former contradictory statements. It was conceded by the State in cross-examination that the witness testified at the coroner's inquest she heard her brother in his room on this night. There was no suggestion in the cross-examination that her testimony as to her brother's presence at home was a recent fabrication. The only point made upon her testimony was that the State insisted she formerly claimed to have heard Frank in his room, not to have seen him, when she was examined before the coroner. Inasmuch as the young lady testified before the coroner that her brother was at home, and the State conceded on the cross-examination at the trial that she had so testified, there was no occasion for her corroboration. There was no necessity for admitting the explanation that she made to Marshall Wright. Whether or not she met Marshall Wright that night was not material to any issue in the case.

Until a witness is impeached, at least by cross-examination, proof of prior consistent statements is inadmissible. Such proof is unnecessary and without value.

"The witness is not helped by it, for even if it is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repe-

titions of it.   Such evidence would be both irrelevant and cumbersome to the trial.''   2 Wigmore on Evidence, section 1124, and cases there cited.

So, being of opinion that no impeachment of this witness on any material detail of her testimony had been attempted by the State, we think the circuit judge correctly excluded the evidence of Marshall Wright as to her explanation made to him.

With due respect to learned counsel pressing the suggestion, the court is unable to see how the evidence excluded could possibly be considered a part of the *res gestae* in this case.

It is said that the court erred in charging the jury that if certain facts were found by them, as set out in the charge, to be true beyond a reasonable doubt, then the defendant would be guilty of murder in the first degree.

It is insisted that the court should have charged that the evidence must exclude every reasonable hypothesis, other than the guilt of the accused, in order for them to convict.   An examination of the entire charge answers this criticism, for we find that the court in another portion of the charge instructed the jury in these words:

''If, therefore, the proof in this case convinces and directs your understanding and satisfies your reason and judgment of the defendant's guilt, you will convict him of the degree of crime, of which you are satisfied that he is guilty; if it does not, you will acquit him. The defendant may be convicted or acquitted upon the

proof of circumstances tending to show his guilt or innocence, as well as by direct and positive testimony showing his guilt or innocence. However, when circumstances alone are relied upon by the State to convict the defendant, then the proof of the circumstances must be so cogent, powerful, and well connected as to satisfy you, beyond a reasonable doubt, of the defendant's guilt, and to exclude every other reasonable hypothesis than that of defendant's guilt. If the circumstances proven, tending to show defendant's guilt, are so powerful, cogent, and well connected as to exclude every reasonable hypothesis than that of defendant's guilt, you should convict him; if they fail, when all taken together, to exclude every reasonable hypothesis than that of defendant's guilt, you should acquit him.''

Returning now to a consideration of the evidence, is it so strong as to exclude every other reasonable hypothesis than that of the guilt of plaintiff in error?

As to the alibi offered in behalf of the plaintiff in error, it is perhaps most charitable to say that this alibi rests alone upon the testimony of his father, his mother, and his sister. The State attempted, with some degree of success, to involve the father in contradictions, making a comparison of his testimony on the trial with his testimony before the coroner. Without considering in detail the evidence of these members of the family of plaintiff in error, it is sufficient to point out that the life of the boy was at stake, and this testimony must be weighed accordingly.

It appears to the court that this alibi is utterly destroyed by a conclusion, forced upon us from other evidence in the record, that Frank Dietzel brought the buggy back to the livery stable at 11:30 p. m. If he did bring the buggy back to the stable at that hour, as a matter of course he could not have been at home during the time at which the members of his family testified he was there. The hour when this buggy was returned is very definitely established by employees of the stable by reference to a passing train; the time of that train being known and proven.

It is impossible to believe that this buggy was returned by anybody other than Frank Dietzel. He took the buggy out, and, if any one else had brought it back, we may be assured that diligent counsel would have developed that fact on the trial. It is virtually conceded by counsel for plaintiff in error that he did secure the buggy at 9:30, and there is no suggestion in the proof offered in his behalf that he turned this buggy over to anybody else, or that anybody else could have returned it to the stable. How can the alibi stand under these circumstances?

It is urged on behalf of plaintiff in error that there was no motive for his crime. It is insisted that his father was possessed of ample means, to which the young man had free access. We do not think the record discloses this condition of affairs. It appears that Herman Dietzel was a man of substance, but, when asked about the money with which his boy was supplied, he said he allowed the boy to have what he (the

father) thought he needed. Herman Dietzel is a self-made man, who started out as a blacksmith, and by thrift accumulated a competency. There is a wide difference between the estimate of such a man, and the estimate of a young man about grown, as to the amount of money the latter needs. The record does not indicate that plaintiff in error had any employment, and that he was short of cash and pressed for funds is evidenced by the fact that his club dues were more than six months in arrears when paid on the day after Wehman's disappearance.

We think it also true that Wehman must have had the reputation in the community of carrying money on his person. Mr. Burdick so states. The circumstance that he had at one time accumulated in his pockets as much as $2,500 could not have escaped notice and general repute in a town like Union City. Furthermore, his landlady testified that he was always counting his money.

What motive could a young man, in the standing of plaintiff in error, have had for seeking the company of an eccentric laborer like the deceased, and driving him around over the country? Could he have been up to anything good?

For what purpose did the plaintiff in error hire this rig on the night of July 11th, and what did he do with it? How did his lap rug become saturated with blood, and whose blood could it have been, save that of the deceased?

Who else was on such terms with deceased as to in-

duce the latter to take a midnight drive with him, and who but the plaintiff in error was it that the witness met returning to Union City on the Protemus road with his face concealed by the lap rug? From whence was this disguised individual coming, except from the scene of this crime?

Why was the plaintiff in error paying his debts on the Sunday after the disappearance of George Wehman? Do men ordinarily settle their obligations on Sunday? If plaintiff in error had the money to pay his club dues prior to Sunday, why should he have delayed, and why should he have waited to settle with his sister-in-law? If he had just gotten this money, where did it come from? Why is no explanation offered as to its source?

Is it likely that the tailor could have been mistaken as to the identity of the $10 bill paid to him by plaintiff in error on the Wednesday following the crime? Could this $10 bill, with its peculiar characteristics, have been mistaken in a small deposit of only $55 accumulated by the tailor in a few days?

Is it possible that Burdick and his wife could have been mistaken as to the identity of the bill they had from deceased?

Were two bills ever worn, torn, and discolored in a manner so strikingly similar as the Burdick bill and the tailor's bill? Could one have been so torn and worn, unless it had been carried with the other? Where could these bills have come from, except from the red tobacco sack where George Wehman carried his roll?

Why did plaintiff in error, perfectly familiar with the country, when making a search for the body of deceased, omit to look into the wells along the lane connecting the Protemus and the Rockbridge roads? Why should he have overlooked these wells, and searched others, both going out and returning?

Why should he have visited this remote locality on the day after George Wehman's disappearance? Why should he have been there on Monday, on Tuesday, on Wednesday, and on other days thereafter? What could have drawn the plaintiff in error to this lonesome lane on the days following the crime, except that mysterious and proverbial force that impels a murderer to return to the scene of his iniquity, or to the place where he has hidden his victim? Why should the prisoner have haunted this vicinity, as long as he was free, unless like that other murderer:

"All night he lay in agony,
    From weary chime to chime,
With one besetting horrid hint,
    That racked him all the time;
A mighty yearning like the first
    Fierce impulse unto crime.

One stern, tyrranic thought, that made
    All other thoughts its slave;
Stronger and stronger every pulse
    Did that temptation crave,
Still urging him to go and see
    The Dead Man in his grave.''

Dietzel v. State.

Who can answer the questions we have propounded so as to exculpate Frank Dietzel from this murder? What explanation of these circumstances can be made to consist with his innocence?

If he can be so exculpated, if there is such an explanation, why does he remain silent? His learned counsel have made a brave fight in his behalf, conducted with zeal and distinguished ability; but notwithstanding all they have said, on the record before us, we are convinced of the guilt of the plaintiff in error. The circumstances seem to us to exclude every other reasonable hypothesis.

Nevertheless, since there is here, as in every case of circumstantial evidence, a possibility (a bare possibility in this case) of mistake, we prefer to heed the expression of the jury and commute this sentence to life imprisonment.

As thus modified, the judgment below will be affirmed.