### IN THE

# SUPREME COURT OF TENNESSEE

### FOR THE

### WESTERN DIVISION.

## JACKSON, APRIL TERM, 1921.

### WILL LYLES v. THE STATE.

*(Jackson.* April Term, 1921.)

1. **CRIMINAL LAW.** Statement to sheriff by witness, made several hours after killing, is not res gestæ.

   Where the homicide occurred at about dusk, statements, made by a witness to the sheriff at 11 o'clock the same night, that it was defendant who did the shooting, were not admissible as part of the *res gestae.* (*Post, p.* 79.)

2. **WITNESSES.** Previous consistent statements generally inadmissible to support witness impeached by inconsistent statements.

   As a general rule, where evidence of contradictory statements is offered to impeach the creditable witness, evidence of former statements, made by the witness, sustaining his testimony, is inadmissible, unless it is charged that the testimony of the witness is a recent fabrication, and is the result of some interest in the cause or motive of personal interest. (*Post, pp.* 72-81.)

   Cases cited and distinguished: Dietzel v. State, 132 Tenn., 71; Legere v. State, 111 Tenn., 373; Queener v. Morrow, 41 Tenn., 134.

70

Lyles v. State.

3. **WITNESSES.** Previous consistent statement when witness had same motive as at trial is inadmissible.

Where a witness was impeached by inconsistent statements previous statements of the same witness consistent with her testimony are inadmissible to support the testimony if they were made at a time when the witness had the same motive for making a false state-ment as she had for giving false testimony at the trial. (*Post, p.* 81, 82)

4. **WITNESSES.** Previous statement of witness for State consistent with testimony held inadmissible.

Where a witness for the State, who identified defendant as the person who committed the homicide, had reason to fear that be-cause of her relations with deceased she might be implicated in the crime, statements by her to the sheriff several hours after the killing to the same effect as her testimony are inadmissible to support it since at that time she had the same motive for placing the blame on accused as at tht trial. (*Post, pp.* 82, 83.)

5. **CRIMINAL LAW.** Admission of previous statements of witness for State held prejudicial to accused.

Erroneous admission of previous statements by a witness for the State, consistent with her testimony that defendant committed the homicide, was prejudicial to accused, where she was the only witness who attempted to identify him as the one who did the shooting, and where she had made no statement connecting him with the killing during several hours intervening between the killing and the arrival of the sheriff. (*Post, pp.* 83, 84.)

---

FROM TROUSDALE.

---

Error to the Circuit Court of Trousdale County.—HON. J. M. GARDENHIRE, Judge.

J. D. McMURRAY, for appellant.

Wm. H. Swiggart, Jr., Assistant Attorney-General for the State.

Mr. L. D. Smith, Special Judge, delivered the opinion of the Court.

Plaintiff in error was convicted of murder in the second decree upon an indictment charging him with having killed his brother-in-law, one Gallie Mitchell, colored, under circumstances constituting murder in the first degree. His motion for new trial having been overruled by the trial judge, he has appealed to this court.

Only two of the assignments of error need be noticed. In the first assignment the defendant contends that the evidence preponderates against the verdict and in favor of his innocence; his defense being that he did not kill the deceased, but that he was at another place, where it was impossible for him to have done it. His second contention is that the court erroneously admitted testimony showing that the principal witness for the State, and the only witness who identifies plaintiff in error as being the man who killed deceased, made a statement some hours after the killing, and before she was examined as a witness, similar to that given in her testimony on the trial, to the effect that it was Will Lyles, plaintiff in error, who killed the deceased.

The deceased and the defendant were brothers-in-law, defendant having married a half-sister of the deceased. They both had homes on the same farm, which belonged to an old colored man named Jim Dunn, who was the grandfather of the deceased and the defendant's wife. At the time of this homicide deceased's mother, Sis Kerley, together with her husband, Henry Kerley, and another son,

Dan Kerley, lived in the home of Jim Dunn. The deceased, Gallie Mitchell, was a son of Sis Kerley, evidently having been born prior to the marriage of Sis and Henry Kerley. Dan Kerley, and Ida Lyles, the wife of the defendant, were the children of Henry and Sis. While defendant and his wife had a home on the farm about a mile and a quarter from Jim Dunn's, at the time of the homicide they were staying at the home of Jim Dunn, where Ida's father and mother made their home, and had been there for some weeks, so that the old people could take care of their children while she aided the defendant in working his tobacco crop. The deceased and his wife lived on the same farm about a quarter of a mile from the Dunn home. The killing occurred late in the evening, about dusk, at the home of the old man Dunn, on Friday, August 14, 1920, Deceased had arranged to take his wife and daughter to the fair at Hartsville on Friday, but instead of doing so he took a negro woman by the name of Lee Hall, who lived in the same neighborhood. There is no direct testimony to show just why he failed to take his wife and daughter and took this particular woman, unless it can be inferred from the evidence, which shows that it was the reputation of Lee Hall that she had been living in adultery with the deceased for a number of years, and it also appears that the wife of the deceased was suspicious of their relationship, judging from a remark she made to her step brother-in-law Dan Kerley. She asked him that morning if deceased was going to take Lee Hall to the fair. Upon his replying that he did not know, she said, "If he carried that bitch to the fair he had better not come back home." The deceased got home from the fair late in the afternoon, and, after having had his supper, went up to Jim Dunn's house, where his

mother and stepfather lived. This was just about dusk. In the meantime the woman Lee Hall, who lived a short distance from the Dunn home, had gotten there. There were at the Dunn home old man Dunn, Henry Kerley, and his wife, Sis, Lee Hall, the deceased, and the defendant's wife, Ida. Dan Kerley was not there. It seems that he had gone away to church during the day, and had not yet returned. The deceased had a son named Gallie Mitchell, Jr., being referred to in the record as Gallie Mitchell, Jr., who was about the same size as Dan Kerley. His whereabouts at the time are not accounted for in the record.

Soon after deceased got over to his mother's home he engaged in a quarrel with his mother. It seems that he had arranged to have them kill and dress a sheep for some kind of an association the next day, and this had not been done. The quarrel became heated, and deceased drew his knife on his mother, and sister, who had intervened when his stepfather Henry Kerley, induced him to go out on the gallery and sit down. Soon after he sat down in a chair on the gallery some person who came into the yard through the gate fired a shotgun at him and killed him. It was dark at this time, as a lamp had been lighted in the room to enable the women to get supper.

The only witness who identifies defendant as being the man who fired the gun is the negro woman Lee Hall. She claims to have been standing in the hallway, and to have seen and to have identified defendant by the flash of the gunfire and the light of the lamp, which was in the kitchen. The deceased evidently saw the man coming toward the house, and thought it was his half-brother Dan Kerley, because he made the remark, as all the witnesses say, when this man came through the gate and approached the house:

"There comes Dan now.  Come on, Dan, we can settle this matter about the killing of the sheep."  Henry Kerley evidently saw the man fire the gun, and he says he thought it was his son Dan at the time, and he made the remark when he saw the man run: "Come back Dan; don't run. You had the right to do it.  This is your home."

Ida Lyles, the defendant's wife, said she was standing right by the side of Lee Hall, and she did not see the flash of the gun.  She claims it was impossible for her or Lee Hall in the position they were to be able to see the party who did the shooting.

The defendant testifies that he did not do the shooting, but that at the time he was at the home of John Volentine, a mile and a half away from the place of the killing.  He is corroborated in this by the testimony of John Volentine and another witness by the name of Hall Hart, both of whom testify that the defendant went to Volentine's house just about dusk—one and one-half miles from the place of the killing, and that he remained there, and was there until news was brought that Gallie Mitchell had been killed.

Shortly after the killing Dan Kerley on his way home met up with young Gallie Mitchell.  Just where they met with reference to the place of the killing is not shown, but it is evident that it was not very far away.  Young Gallie told Dan that his father had been killed, and that they were claiming that he (Dan) had done it.  Dan and young Mitchell went immediately over to John Volentine's house and told them about the killing.  The defendant was there when they got there.

The State's witness, Lee Hall, although she claims to have identified the defendant as being the man who fired the gun, did not say anything about her identification of

the defendant or about having seen the man who did the killing, although she admits that she heard the deceased speak of the man who did the shooting as his brother Dan Kerley, and heard Henry Kerley call to the man who did the shooting, and refer to him as his son Dan.

She says she went immediately after the killing and told Betty Mitchell, the wife of the deceased, about her husband having been killed. She says she does not know why she did not tell Betty Mitchell who had killed her husband. She admits that she never made any statement to that effect until about eleven o'clock that night, when the sheriff came there. When Sheriff Parkhurst came she told him that the defendant, Will Lyles, was the man who did the killing.

The only person who might have possibly done this killing besides the defendant and Dan Kerley is young Gallie Mitchell. He was not introduced as a witness, and his whereabouts on this occasion are not accounted for. That he was somewhere near the premises is established by the fact that he and Dan Kerley got together shortly after the killing and went over to John Volentine's house to convey the information about the killing. It appears that he came on home after the State's witness Lee Hall had come to report that Gallie Mitchell had been killed.

A circumstance relied upon by the State as tending to show the guilt of the defendant is this: After Sheriff Parkhurst arrived on the scene he was informed by Jim Dunn that he had a shotgun there on the place. The defendant then spoke up, and said that the gun was down at his house. Sheriff Parkhurst and defendant went down to his house and looked for the gun under the bed, where the defendant said it was, but it was not there. Defendant's explana-

tion is that he had borrowed the gun sometime before, and it was so rusty it would not shoot, and that he had oiled it and put it under the bed, and thought it was there. He did not know what had become of it.

On the motion for new trial the defendant introduced an affidavit of one Bill Hart, colored, who testified that some time after the killing he saw Jim Mitchell, a son of the deceased, with a gun stock, and that Mitchell said it was the stock of the Jim Dunn gun, and that he had found it hidden in a rock fence over on the Harris branch. Defendant testified that Young Gallie Mitchell was living over on the Harris branch when the killing occurred near where this gun stock was found.

The only direct testimony in this record to connect the defendant with the killing in this case is that of Lee Hall. There were a number of witnesses introduced who testified that she was a woman of bad character, and not entitled to full faith and credit on oath. These witnesses show that their information as to her character is based upon the fact that she was a notoriously lewd woman, and that it was generally reputed and understood that she was living in adultery with the deceased. The State introduced several witnesses, who testified that her character was good except upon the subject of lewdness. They say that it was a part of her reputation that she was being kept by the deceased. It is an established fact that their relationship was so intimate that he took her to the fair in preference to his wife and daughter. Lee Hall swears positively that she never had any illicit relations with him whatever.

The deceased himself did not recognize the person who did the shooting as being the defendant, but, on the con-

trary thought it was his half-brother Dan Kerley. He was certainly in better position than any of the others to identify the party. He was out on the gallery. Furthermore Henry Kerley did not identify the man as being the defendant, but he thought at the time also that it was his son Dan. In his testimony he says that he is satisfied now that it was not Dan, but does not testify as to who he thinks did it. On the contrary, he says that he does not know.

The defendant's wife and her mother both testify that the Hall woman was not in position where she could see the party at all. In addition to that it was dark. She was in the house when she claims to have identified the man by the flash of the gun and the light of a lamp which was sitting on the table in the kitchen. In addition to this, and notwithstanding the fact that she knew that other persons present thought it was Dan Kerley who had done the shooting, she made no statement at that time as to who she thought it was, and when she reported the killing to the wife of the deceased she gave no intimation that she had identified the person.

We have the positive testimony of the defendant himself and two disinterested witnesses, showing that the defendant was at the home of Volentine one and one-half miles away at the time of the killing.

Under this evidence it is quite clear that the great weight of the evidence is in favor of the defendant's innocence, and it is quite inconceivable that a jury could have found a verdict of guilty thereon, unless they attached great weight to the fact testified to by the sheriff that this woman Lee Hall, when he went to the scene of the killing about eleven o'clock after the killing had occurred about dark, told him that the defendant, Will Lyles was the man who

Lyles v. State.

had done it. The jury evidently reasoned that the testimony of this witness was reliable, in view of her having made the same statement to the sheriff on the night of the killing. It is certainly doubtful, even if this testimony is admissible at all, whether it is entitled to that weight which is sufficient to overcome the great weight of the proof which tends to show that the defendant was not guilty.

This brings us to a consideration of the admissibility of the testimony of the sheriff and of the witness Lee Hall to the effect that she made the statement to the sheriff about eleven o'clock after the killing that the defendant was the man who had done it. The testimony was duly excepted to, and the exception overruled and preserved.

The record indicates that this evidence was admitted upon the theory that it was a part of the *res gestae*. Clearly it was not admissible upon this ground. It was simply a narrative by one of the witnesses of what had taken place several hours before. This admission cannot therefore be sustained upon that ground. The only theory upon which it can be reasonably argued that the evidence was admissible is that it is confirmatory of the testimony given by the witness on the stand. There is no pretense that the defendant was present when the statement was made.

As was said by this court in *Dietzel* v. *State*, 132 Tenn., 71, 177 S. W., 54:

"The general rule undoubtedly is, where evidence of contradictory statements is offered to impeach the credit of a witness, testimony that on former occasions the witness made statements sustaining those made by him on the stand is inadmissible."

But this court has recognized an exception to the rule in *Legere* v. *State,* 111 Tenn., 373, 77 S. W., 1060, 102 Am. St. Rep., 781. This exception is stated in the opinion in that case as follows:

"The courts in America have grafted certain exceptions upon this rule, and so fixed are they that it may be considered now that of themselves they constitute an independent rule. And so, it may be said, it is now established in this country that where it is charged the testimony of the witness is a recent fabrication, and is the result of some relation to the party or cause, or of some motive of personal interest, it may be supported by showing he had made a similar statement before that relation or motive existed."

The real reason behind this exception is that a consistent statement was made at a time when there was little, if any, temptation to speak an untruth with regard to a matter afterwards brought into controversy. Or, as was said by this court in *Queener* v. *Morrow,* 1 Cold., 134:

"But there would seem to be some show of reason in the doctrine, that where it was attempted to establish that the statement on oath is a fabrication of recent date, or where a design to misrepresent, from some motive, is imputed to the witness; or where it is sought to destroy his credit, by proof of contradictory representations; evidence of his having given the same account of the matter, at a time when no motive or interest existed, and no influence had been brought to operate upon him to misrepresent the facts, ought to be received, because it naturally tends to inspire increased confidence in the truth of the sworn statement. To this extent, we think, the principle is reasonable and just."

Lyles v. State.

Does the reason of the rule thus stated bring the rule into operation in this case? In order for it to have this effect there ought to be something from which it could be reasonably inferred that there was no motive, interest, or influence calculated to induce her to misrepresent the facts at the time she made the statement offered as confirmatory evidence to her testimony. Immediately after the killing, when this woman knew that another person was being charged with the offense, and when she ought to have spoken, she withheld any knowledge upon her part that the person who did the killing was the plaintiff in error. In the conversation that she had soon after the killing with the wife of deceased she made no reference to her knowledge that it was the plaintiff in error who had done the killing.

It is always difficult and quite frequently impossible to get any clear and definite understanding of the motives which actuate the conduct of people, and before a confirmatory statement can be admissible under the rule the court ought to be able to find some reasonable basis for the conclusion that there existed no motive, interest, or influence to actuate the statement of a falsehood. It would seem that such a situation is more likely to exist immediately following the tragedy than several hours afterwards, when the witness had had time for reflection. This is particularly true in this case. It appears that the State's witness became apprehensive that she might be charged with having had something to do with the killing, because she made the statement to the people there that she hoped that they would not think she had anything to do with it. She was conscious of the fact that the deceased had taken her to the fair that day in preference to his own

wife. She evidently knew of the talk of the neighborhood of her illicit relationship with the deceased, and, of course, was not ignorant thereof if indeed it were a fact. She had had a fight with a negro woman at the shop of the deceased. She says this was brought about by lies which deceased's wife had told her husband about her; that is, that she was a "whore and a liar."

Reflecting upon the facts just stated, it is easy to see that they may have influenced her in making the statement which she made to the sheriff. The sheriff was there making an investigation with a view of ascertaining the perpetrator of this crime, and we cannot say under a situation of this sort the statement which she made to the sheriff was free from ulterior motives, and that there existed little, if any, likelihood of her misrepresenting the facts. This same motive and influence which inspired her statement to the sheriff was in full operation when she testified as a witness. Any confirmatory statement which is subject to the same criticism as the testimony itself could, of course, not have the effect to bolster up the testimony.

It might be argued with some show of plausibility that there was no motive or influence to induce her to testify falsely if she had made a consistent statement thereof from the beginning, but since it appears that the first statement which she made, or her silence when she ought to have spoken the truth, is inconsistent with the statement offered as confirmatory of her testimony, there is left no fragment of the reason which forms the basis of this exception to the general rule. Whatever motive or influence induced her to make the statement to the sheriff was still in existence when she was offered as a witness; and, there being no evidence upon which an inference can be drawn

Lyles v. State.

with any degree of certainty that there was no ulterior motive or influence to inspire the statement of a falsehood at the time the confirmatory statement was made, there can be no reason for supposing that it affords any additional strength to her testimony.

In other words, there was nothing in her situation at the time she made the supposed confirmatory statement calculated to inspire confidence in its truthfulness other than existed at the time of the trial. Her testimony must therefore stand or fall upon its own merit without support by the statement offered for its confirmation.

The case falls clearly within the principle stated by this court in the case of *Queener* v. *Morrow*, supra:

"But to allow consistent statements, for the purpose of giving support to the credit of the witness, made after the contradictory representations by which it is sought to impeach him, would be to put it in the power of every unprincipled witness to bolster his credit, and, perhaps, escape the just consequences of his own falsehood and tergiversation."

There is no reason to be found in this record to take this case out of the general rule as above stated, and the rule is particularly applicable to a case like this, where the statement offered as confirmatory evidence is inconsistent with statements made previously thereto, and under circumstances more calculated to inspire confidence in their trustworthiness.

Confessedly the admission of this testimony was prejudicial to the plaintiff in error. There was substantial evidence in favor of the innocence of the plaintiff in error, and practically nothing to the contrary, except the testimony of this witness Lee Hall. It is difficult to see how

the jury could have convicted the plaintiff in error, unless they gave great weight to the testimony of the sheriff proving this statement of the witness as confirmatory of her evidence. Certainly we cannot say that it had no influence upon the minds of the jury. Its admission being prejudicial and erroneous, the judgment of the court below must be reversed, and the cause remanded for a new trial.