[No. 27751.   Department Two.   November 28, 1940.]

RALPH S. SWEAZEY, *as Administrator, Respondent,* v.
VALLEY TRANSPORT, INC., *et al., Appellants.*[1]

[1]Reported in 107 P. (2d) 567; 111 P. (2d) 1010.

*Poe, Falknor, Emory & Howe (Kenneth C. Hawkins, of counsel), for appellants.*

*Padden & Moriarty* and *P. O. D. Vedova,* for respondent.

JEFFERS, J.—This action was instituted by Ralph S. Sweazey, administrator of the estate of R. Lawrence Faye Sweazey and Laura Finck Sweazey, deceased, to recover damages against the defendants, Valley

Transport, Inc., and Faye Sparger, for the alleged wrongful death of Lawrence Sweazey and Laura Sweazey, husband and wife. The action was brought for and on behalf of, and for the benefit of, the three minor children of Mr. and Mrs. Sweazey, namely: Margaret Joanne Sweazey, age five years; Elizabeth Anne Sweazey, age seven years; and Maxine Louise Sweazey, age nine years; and for and on behalf of the estate of Mr. and Mrs. Sweazey.

The death of Mr. and Mrs. Sweazey occurred as the result of a collision between an oil truck and semitrailer, owned and operated by defendant Valley Transport, Inc., and being driven at the time by defendant Faye Sparger, an employee, and an automobile owned by Mr. and Mrs. Sweazey, and being driven at the time by Lawrence Sweazey, deceased. The collision occurred near Blue lake, in Douglas county, Washington, on August 10, 1937, at about the hour of twelve twenty p. m. The highway upon which the accident occurred is a state highway, having an oiled surface of about twenty feet, and running northeasterly and southwesterly around the west and north side of the lake.

On the day of the accident, Mr. Sparger, with a full load of gasoline, was driving along this road toward Coulee City, which would place him on the side of the road next to the lake. Mr. and Mrs. Sweazey, with their three minor children, above named, were driving southwesterly along this road toward Soap Lake. The truck and car came together, and Mr. and Mrs. Sweazey were killed.

The complaint alleges that the defendants were negligent in the following particulars:

(1) That defendant's truck was of excessive width, length, and weight, and because thereof was a dan-

gerous instrumentality to be operated along and upon the highway;

(2) That defendant's truck was being operated on a curve on the highway in such a manner that the truck extended over the center of the highway and into that portion of the highway in which the automobile being driven by Lawrence Sweazey was entitled to be, and was being, operated;

(3) That the truck was being operated at a high, dangerous, and unlawful rate of speed, to-wit, at a speed in excess of forty miles an hour;

(4) That the operator of defendant's truck failed to extend to the Sweazey car one-half the highway;

(5) That the driver of the oil truck failed and neglected to keep the truck under control, or to keep a reasonably careful lookout ahead to determine the condition of the highway and the position of other vehicles on the highway;

(6) That the operator of the truck, when he saw, or by the exercise of reasonable care should have seen, that a collision was imminent, failed and neglected to exercise reasonable care to avoid a collision, when by the exercise of reasonable care he could have done so.

Defendants by their answer deny the allegations of negligence in plaintiff's complaint, and allege affirmatively that, if Mr. and Mrs. Sweazey died as a result of the accident, their death was proximately caused and contributed to by the careless acts and negligence of Lawrence Sweazey.

The cause came on for hearing before the court and jury, and thereafter, on February 3, 1939, the jury returned a verdict in favor of plaintiff. Motions for judgment notwithstanding the verdict and for new trial were timely made and denied, and on May 3, 1939, the court entered judgment on the verdict, and this appeal by defendants followed.

In view of the conclusion we have reached that a new trial must be granted in this case, it will be necessary to set out the facts as established by the evidence only in so far as may be necessary to a discussion of the assignments of error.

While appellants have argued assignments of error Nos. 1, 2, 3, and 4 under one heading, we shall discuss them separately.

The first assignment of error is based upon the admission by the court of exhibit No. 36. Theodore Wilson, who was driving an educational tour bus, which had been following the oil truck for some miles, was called as a witness by respondent and testified to the effect that he had tried to pass the oil truck several times before the point of the accident was reached, but could not because the truck was so far over toward the center of the highway. This witness further testified to the effect that, just before the collision, and as the truck was going around a curve, the truck was over too far toward the center of the road; that it was traveling about forty miles an hour. On cross-examination, the witness admitted signing the following statement, at Spokane, Washington, the day after the accident:

"Theodore Wilson,
"115 N. 15th St.,
"Schockton [Coshocton], Ohio.
    "I am employed by Greater University Tours.
    "On August 9th, about 12:00 noon I was driving a tourist bus on the road between Seattle and Spokane, Washington, and had reached a point about 12 to 15 miles east of Soap Lake, Wash. I had about 30 passengers. We came up behind an oil tanker driven by Faye Sparger and followed him for six to eight miles. I kept back of the tanker about a half a block. I was traveling about twenty-five miles an hour and my speed was constant. The truck was traveling the same speed and had been for most of the time we followed it.

"The tanker kept well on his right side of the road. At any time I could have passed the tanker without using the horn as he kept well on his side of the road.

"At the place of the collision there was a wide curve and you could see for about a half mile ahead. I did not see the Ford V8 as the tanker was in front of me. I heard the crash and immediately stopped about 75 feet from the tanker and Ford V8. When the cars stopped after the impact, the tanker which had been hit on the left side went across the road to the driver's left and landed in a ditch on its side. The Ford was turned around in the road and was headed east.

"The driver of the tanker was alone. In the Ford there were 6 people, a man, his wife and 4 children. One child, a baby, and the wife were killed outright. I understood the man died later. The other three children were hurt.

"The driver of the truck appeared to me to be a careful driver and was on his own side of the road. In my judgment the reason for the collision was that the driver of the Ford was coming on the inside of the curve, he must have been on the wrong side of the road, and driving at a high rate of speed.

"I have read the above statement and the facts are correctly stated.

"Aug. 12th, 1937                THEODORE WILSON."

Mr. Wilson also admitted having made statements at the time of the accident to E. W. Schwellenbach, then prosecuting attorney and coroner of Grant county, and to Floyd Hansen, deputy sheriff of Grant county, to the same effect as those contained in his statement made at Spokane. The witness testified that he made the statements to Mr. Schwellenbach and Mr. Hansen and the one in Spokane because his boss, C. V. Ress, told him to say anything so that he would not be held as a witness and thus delay the caravan. It appears that there were several bus-loads of teachers from the middle west touring the country, and the bus driven by Mr. Wilson was one of the caravan. It does not appear that any officer attempted to detain Mr. Wilson.

After the introduction of the statement made by Wilson in Spokane, which was exhibit No. 35, respondent offered exhibit No. 36, which was a statement made by Wilson at Coshocton, Ohio, on September 11, 1937, at the request of Mr. Sweazey, respondent herein, who went to Coshocton to interview Wilson and secure a statement. This statement was as follows:

"Coshocton, Ohio
"September 11, 1937.

"I was contacted by a man who represented himself as a friend of the oil company in connection with accident of August 10, 1937. He claimed the whole family were wiped out and in order to protect the driver he asked me for a statement.

"I had on account of their tragedy had a hilarious night of which I passed completely out from liquor. It was the only way I could rejuvenate my nerves. Not knowing the real facts of the case or that the children were alive, I falsified the statement I made to protect the driver. Now that I am steady and have vision of what really happened I would like to make a clear statement.

"I was following tanker for five or six miles and when we come to take curves we were driving about 35 miles per hour but after we rounded to the straight away he pulled away from me. My vision of the location of the tanker was impaired but by judging from the position of the rear end and the length of the unit, I would reasonably think the front end of right wheels were about 5 foot from edge of paving on right side. It all happened so quickly. After I have thought I truthfully believe that if the driver had been obeying the speed law set by the state and had also had his heavy unit under proper control on the right side of the road this accident could have and would have been avoided.

"This statement is of my own free will and accord in sound and sane mind.

"Signed, THEODORE WILSON."

Strenuous objection was made by appellants to the introduction of exhibit No. 36, but the court admitted it.

This matter presents a difficult question, and one upon which there is much authority and a considerable difference of opinion. Respondent earnestly contends the question is settled by our own decisions, but after a careful consideration of these decisions and many additional cases, we are unable to agree that, under the facts of this case, our decisions are controlling in favor of respondent.

The general rule announced in practically all states, including our own, is that the testimony of a witness cannot be bolstered up or supported by showing that the witness has made statements out of court similar to and in harmony with his testimony on the witness stand. *Conrad v. Griffey,* 11 How. (U. S.) 480, 13 L. Ed. 779; *Craig v. Craig,* 5 Rawle (Pa.) 91; *Judd v. Letts,* 158 Cal. 359, 111 Pac. 12, 41 L. R. A. (N. S.) 156; *Loomis v. New York etc. Co.,* 159 Mass. 39, 34 N. E. 82; *Russell v. Cavelero,* 139 Wash. 177, 246 Pac. 25.

To the general rule above announced, there are certain exceptions, one of which is that, where the testimony of the witness is assailed as a recent fabrication, consistent statements may in certain instances and for certain purposes be admitted. *Burks v. State,* 78 Ark. 271, 93 S. W. 983, 8 Ann. Cas. 476 and note; *McCord v. State,* 83 Ga. 521, 10 S. E. 437; *Griffin v. Boston,* 188 Mass. 475, 74 N. E. 687; *Glass v. Bennett,* 89 Tenn. 478, 14 S. W. 1085. See, also, *Chicago City R. Co. v. Matthieson,* 212 Ill. 292, 72 N. E. 443; *Baltimore City Passenger R. Co. v. Knee,* 83 Md. 77, 34 Atl. 252; *Clever v. Hilberry,* 116 Penn. 431, 9 Atl. 647.

A further exception is sometimes recognized where the witness has been impeached by a prior inconsistent statement; but this exception is not recognized

by the courts of most of the states, unless the prior inconsistent statement is coupled with a claim of recent fabrication or motive to falsify the testimony on the witness stand. See note 41 L. R. A. (N. S.) 857, at 890, under heading "Charges of recent fabrication of testimony." Also, see note 8 Ann. Cas. 477, where the rule is stated and many cases cited.

The authorities generally hold that, when a witness is impeached by evidence tending to show that his sworn testimony is a recent fabrication, consistent statements made by that witness prior to the claimed fabrication may be admitted to refute the impeaching evidence. Where the witness's testimony is discredited by an imputation of bias or prejudice or other motive to falsify, his consistent statements made at a time anterior to the date of the facts, from which the motive to falsify is inferred, tend to show that bias or prejudice did not motivate his testimony. Where the witness has been impeached by an alleged prior inconsistent statement, a small minority admit the prior consistent statements, on the theory that they tend to show the unlikelihood of the witness having made an inconsistent statement. In no one of these recognized exceptions to the general exclusionary rule is the prior consistent statement admissible to corroborate the witness's testimony. The sole purpose of the introduction of the consistent statement is to refute the impeachment. *State v. Braniff*, 105 Wash. 327, 177 Pac. 801. The admission of consistent statements for this purpose, rather than in proof of the truthfulness of the contents of such statement, does not violate the hearsay rule. *Russell v. Cavelero, supra.*

The instant case does not necessitate a consideration of whether or not impeachment solely by reason of a prior inconsistent statement raises the issue of recent fabrication.

We think the testimony of the witness Wilson was so assailed in this case by counsel for appellants that an argument might well have been made that his testimony was of recent fabrication. *State v. Spisak,* 94 Wash. 566, 162 Pac. 998. There need be no express attack upon the witness's story as a recent fabrication; it is sufficient if the evidence discloses an attempt to impeach. *Callihan v. Washington Water Power Co.,* 27 Wash. 154, 67 Pac. 697, 91 Am. St. 829, 56 L. R. A. 772; *Conover v. Neher-Ross Co.,* 38 Wash. 172, 80 Pac. 281, 107 Am. St. 841; *State v. Spisak, supra; Russell v. Cavelero, supra.*

Appellants argue that prior consistent statements are not admissible when the witness admits making the prior inconsistent statement by which he is impeached. This argument is sound where no contention is made that the present testimony is recently fabricated to meet the exigencies of the case.

As stated above, most courts exclude prior consistent statements, unless the impeaching inconsistent statement is coupled to a claim of recent fabrication. In the few states which do not follow this majority rule, the only purpose for which the consistent statement is admitted is to rebut the making of the inconsistent statement. We are not concerned with the soundness of this minority rule, in the instant case, for the reason that the witness admitted making the inconsistent statement, which admission destroys the basis for applying the minority rule. *Childs v. State,* 55 Ala. 25; *Stewart v. People,* 23 Mich. 63, 9 Am. Rep. 78. Under such circumstances, the only purpose of the prior consistent statement would be to corroborate the present testimony, on the theory that its repetition is conducive to the truth of its assertion. To admit such a consistent statement for the purpose last above mentioned, would certainly violate the hearsay evidence

rule. *Russell v. Cavelero, supra; State v. Creed,* 299 Mo. 307, 252 S. W. 678.

■ Not every consistent statement made by a witness prior to the time his testimony is given is admissible to rebut the claim of recent fabrication. Unless the statement was made before the time when its ultimate effect and operation could be foreseen, it lacks any probative value to rebut the claim of recent fabrication. A statement made by a witness when its use to meet a claim of recent fabrication is foreseeable, has no relevancy as tending to prove the charge of recent fabrication is false. In *Callihan v. Washington Water Power Co., supra,* we stated:

"Another exception to the rule is that, if a witness be impeached by proof of his having previously made statements that were in contradiction of evidence tending to show that the witness's account of the transaction was a fabrication of a recent date, it may be shown that he gave a similar account, *before its effect and operation could be foreseen.*" (Italics ours.)

See, also, *Abernathy v. Emporia Mfg. Co.,* 122 Va. 406, 95 S. E. 418; *People v. Dowell,* 204 Cal. 109, 266 Pac. 807; *Flach v. Ball,* 209 Mo. App. 389, 240 S. W. 465. We desire to call particular attention to *Lyles v. State,* 146 Tenn. 70, 239 S. W. 446.

■ The relevancy of a consistent statement is determined by the facts in each particular case. It cannot be said to be governed by the mere lapse of time between the date of the event testified to and the date of the prior consistent statement. Nor do we think it should be controlled entirely by whether or not the statement was made prior to the inconsistent statement, although each of the factors may be important as bearing on the relevancy of the statement in the particular case. We are of the opinion the sole inquiry is whether or not the statement was made at such a

time and under such circumstances that there was then no opportunity for outside suggestion, no probability of the statement being inspired by others—in other words, no apparent motive for falsifying. We are of the opinion the circumstances under which exhibit No. 36 was made do not meet the above requirements.

It is contended that the witness Wilson had no personal interest in the matter, and no motive to falsify at the time he made the statement in Ohio (exhibit No. 36). However, the statement was made out at the express request of respondent, who had gone to Ohio for that purpose. The statement expressly refers to the prior inconsistent statement made by the witness, from which it must be inferred that the witness made exhibit No. 36 with the former inconsistent statement expressly in mind. Exhibit No. 36 was made to respondent; it was made at a time when litigation was probable; and we think there can be no other reasonable assumption than that it was made expressly to rebut the inconsistent statement previously made by the witness. This is not an instance of a consistent statement made to some party not interested in the matter and under circumstances which indicate it was not made for the express purpose of avoiding the effect of a prior inconsistent statement.

We are firmly convinced that a consistent statement should not be admitted when made under circumstances from which it reasonably appears that the statement was made and obtained for the purpose of fortifying a witness to meet an expected impeachment; in other words, when its effect and operation were foreseeable.

Respondent particularly relies upon the case of *Russell v. Cavelero, supra,* and the cases therein referred to, namely: *State v. Manville,* 8 Wash. 523, 36 Pac. 470; *State v. Coates,* 22 Wash. 601, 61 Pac. 726; *Callihan*

*v. Washington Water Power Co.,* 27 Wash. 154, 67 Pac. 697, 91 Am. St. 829, 56 L. R. A. 772; *Conover v. Neher-Ross Co.,* 38 Wash. 172, 80 Pac. 281, 107 Am. St. 841; *State v. Spisak,* 94 Wash. 566, 162 Pac. 998. In none of the cases cited by respondent, with the exception of the *Callihan* case, *supra,* is the question of the foreseeability of the effect and operation of the consistent statement mentioned, and we feel justified in assuming that it was not raised, or at least not considered material to the decision. In the *Callihan* case, we expressly recognized the rule, as shown by the quotation from that case hereinbefore set out.

Can it be seriously contended that exhibit No. 36 was made at a time when its effect and operation could not be foreseen? We think not.

In addition to the above general statements relative to the cases cited by respondent, we call attention to different factual situations in the cited cases. In the *Russell* case, *supra,* the consistent statement was made almost immediately after the injury and prior to the inconsistent statement. In other words, so far as the opinion shows, the consistent statement was made at a time when its effect and operation could not have been foreseen, in so far as its effect on any inconsistent statement was concerned.

In *State v. Spisak,* the witness denied making the inconsistent statement, and in addition the claimed consistent statement was made the same day as the inconsistent statement, and to a party in no manner interested in the statement.

In the *Manville* case, the questionable testimony was admitted for the purpose of showing whether or not the witness had, in fact, made the contradictory statement claimed to have been made by him.

We conclude that, under the facts of this case, the trial court erred in admitting the consistent statement

(exhibit No. 36). In view of the importance of Mr. Wilson's testimony to respondent's cause, and the obvious prejudicial effect which exhibit No. 36 would have on appellants' impeaching testimony, we are of the opinion the admission of the exhibit was also reversible error.

In view of the conclusions reached by us in regard to assignment of error No. 1, it is not necessary to discuss assignment of error No. 2.

■ Assignment of error No. 3 is based upon the sustaining by the court of an objection to the following question propounded to the witness Wilson by appellants: "Well, you were posing as her husband, weren't you?" What appellants were attempting to bring out was that Mr. Wilson and some woman on the bus were posing as man and wife, when in fact they were not married. It is appellants' contention that this line of questioning was permissible for the purpose of affecting the credibility of the witness.

Mr. Wilson testified that he was married, and that the last time he saw his wife was at Coshocton, Ohio; that his wife was not along on this trip, and was not with him on the bus.

Elenora Strate, one of the teachers on the bus, testified that Mr. Wilson's supposed wife was seated on her left. Miss Strate was then asked:

"Q. That was his wife, wasn't it? A. No, it wasn't, because I was very much surprised— Q. (Mr. Padden interrupting) Who was sitting alongside you? Were you sitting alongside Wilson or not? A. No, sir, his wife was."

Miss Ridings, another teacher on the bus, when examined in regard to her position in the bus, testified:

"Q. And who was immediately in front of you? A. Miss Strate, from Indiana, and Mrs. Wilson, Martha Wilson. Q. Who is Martha Wilson? A. She had mar-

ried this Ted Wilson, the bus driver. Q. She was the bride? A. Yes, sir."

We are of the opinion the question was not proper, under the rule announced in *Warren v. Hynes*, 4 Wn. (2d) 128, 102 P. (2d) 691.

■ In any event, appellants were not prejudiced by the court's ruling, as the testimony of Mr. Wilson and the other witnesses, as hereinbefore set forth, was before the jury.

Assignment of error No. 4 is based upon the refusal of the court to grant an extension of time in which to file the affidavit of C. V. Ress, in support of appellants' motion for new trial, in which affidavit Ress denied that he gave any instruction to Mr. Wilson to falsify the statement given by Wilson to appellants. In view of the fact that, for reasons stated elsewhere herein, a new trial must be granted, no discussion of this question is necessary.

■■ Assignment of error No. 5 is predicated upon the reception of evidence relative to defective brakes on appellants' truck and trailer. It is appellants' contention that this evidence was improperly admitted, for the reason that the complaint contained no allegation relative to defective brakes. The trial court admitted testimony relative to the claimed defective brakes, on the theory that it was admissible under the following general allegation of the complaint (subd. 5, paragraph 5), and especially that part relative to keeping the truck under control:

"In that the said driver of the oil truck failed and neglected to keep the said oil truck under control, or to keep a reasonably careful and prudent lookout ahead for and to observe the condition of said highway and the position of other vehicles upon said highway at the place in question, and failed and neglected to keep to the extreme inside of said highway on said curve."

We are inclined to the view that the testimony was admissible under the above general allegation. See *Carlson v. Herbert,* 118 Wash. 82, 203 Pac. 30.

However, we have examined the testimony of Ralph Sweazey, to whose testimony the objection was directed, wherein appear the first statements relative to defective brakes on appellants' truck and trailer, and we find that several pages of testimony relative to brakes on this kind of equipment and as to the condition of the brakes on the truck here in question had been given before any objection to the testimony was made by appellants, or before motion to strike the testimony was made. No surprise was claimed or continuance asked for. It also appears that counsel for appellants proceeded to cross-examine this witness on this question, and also put on testimony by their own witnesses relative to the condition of the brakes on the truck and trailer. Under this situation, we do not think the court erred in holding that the objection and motion came too late, and that the pleadings would be considered amended to conform to the proof. See *Keisel v. Bredick,* 192 Wash. 665, 74 P. (2d) 473.

Assignment of error No. 6 is based upon the contention that the trial court granted appellants' motion to withdraw from the consideration of the jury subdivision 1 of paragraph 5 of the complaint, which reads as follows:

"In that defendant's oil truck at the time in question was of excessive width, length and weight, and because thereof was a dangerous instrumentality to be operated along and upon the highways of the state of Washington, and particularly the highway in question, taking into consideration the width and condition of said highway;"

and then refused to instruct the jury of such withdrawal.

While we believe the testimony conclusively shows that the truck and semi-trailer were within the statutory requirements as to width, length, and weight, and therefore were not in themselves the basis of any negligence, we are further of the view that the jury had the right to consider the width, length, and weight of this equipment as bearing on the question of due care. While it might have been better to limit this testimony, we are satisfied no prejudice resulted to appellants, especially in view of the fact that the court gave the following instruction:

"I instruct you that the law permits vehicles to be operated lawfully on the highways when they do not exceed in width eight feet, and when they do not exceed in height twelve feet and six inches, and when not in excess of thirty-five feet in length; or in combination in excess of sixty feet in length; a two-axle semi-trailer with a gross weight up to twenty-six thousand pounds, and the gross weight of any vehicle supported on two axles up to twenty-four thousand pounds, or a joint gross weight up to fifty thousand pounds."

Also, in instruction No. 30 the jury were told that, before respondent could recover, he must prove that the driver of the truck was guilty in one or more respects as alleged, which allegations of negligence as submitted to the jury contained no reference to width, length, or weight of the truck and trailer.

Assignment of error No. 7 is predicated upon the refusal of the court to strike from the charge of negligence subdivision 7 of paragraph 5 of the complaint, reading as follows:

"In that the operator of said oil truck, when he saw or by the exercise of reasonable care should have seen, that a collision was imminent, failed and neglected to exercise reasonable care to avoid said collision, when by the exercise of reasonable care he could have done so."

After the evidence was all in, appellants moved that the above allegation of negligence be withdrawn from the consideration of the jury. It is the contention of appellants that this allegation placed before the jury the doctrine of last clear chance, and that there was no evidence to support it. When this motion was made, the following occurred between the court and counsel for respondent:

"MR. PADDEN: You don't need to argue the last clear chance. . . . THE COURT: I don't conceive that that raises the question of last clear chance. MR. PADDEN: It might, Your Honor, but I don't think that is the gist of this allegation. THE COURT: I haven't prepared an instruction on that. MR. PADDEN: And you will notice that I have requested no instruction on the last clear chance. THE COURT: So that counsel will know what is running through the court's mind, the court construed this as an allegation of lack of reasonable care under all the circumstances. MR. PADDEN: That is correct."

Finally, the court concluded with this statement:

"I think I will deny the motion. I am not going to instruct on the doctrine of last clear chance."

We are satisfied there was no evidence in this case which would sustain the doctrine of last clear chance.

No exception was taken to instruction No. 2, wherein the above allegation is found, or to instruction No. 30, hereinbefore referred to; nor does it appear that, after the instructions were given, the trial court's attention was called to appellants' contention relative to this allegation. We are therefore of the opinion appellants cannot now claim error on the inclusion of the above allegation in instruction No. 2. *Ittner v. McDonald,* 190 Wash. 526, 69 P. (2d) 566.

In justice to the trial court, we believe it should be stated that it is apparent the court did not intend

to submit any instruction on last clear chance, as he gave instruction No. 28, which is as follows:

"I instruct you that if you find that both R. Lawrence Faye Sweazey and the defendants were negligent and the negligence of both parties contributed to the accident, then I instruct you that the plaintiff cannot recover. It is the law that where both parties to an accident are negligent the plaintiff is not entitled to recover."

Assignment of error No. 8 is based upon the striking of the testimony of Allen Humason, county engineer for Grant county, so far as it was dependent upon the map furnished his office by the state highway department. We do not deem it necessary to discuss this assignment, other than to say that, in our opinion, the court did not err in holding that a map sent by the highway department in Olympia to Mr. Humason had not been sufficiently identified as an official document to entitle it to be admitted for the purpose for which its admission was sought, and the court did not err in striking certain testimony of the witness Humason, based upon this map which had not been admitted.

Instruction No. 21, given by the court, and to which assignment of error No. 9 refers, states:

"You are instructed that when a person is injured and dies as a result of a collision, a presumption arises that the person killed was at the time exercising due care, when there is no credible evidence to the contrary."

Instruction No. 22, given by the court, and to which assignment of error No. 10 refers, is as follows:

"You are instructed that when a person is injured and dies as a result of a collision, a presumption arises that the person killed was at the time exercising due care and that he did all that the situation then and there presented to him required him to do to save him-

self from injury, when there is no credible evidence to the contrary."

The instruction presented by appellants, which the court refused to give, and to which assignment of error No. 11 refers, states:

"I instruct you that under the evidence in this case there is no presumption that R. Lawrence Faye Sweazey at the time of the collision was in the exercise of due care. The burden is upon the plaintiff to establish by a fair preponderance of the evidence that at the time of the collision the defendants were guilty of the acts of negligence charged, and, if the plaintiff has not established by a fair preponderance of the evidence that the defendants were guilty of the acts of negligence charged, then it is your duty to return a verdict for the defendants."

It is appellants' contention that, in the instant case, the presumption of due care was overcome by the testimony of disinterested witnesses, and therefore no instruction on the question of presumption should have been given to the jury.

While many witnesses testified in this case, the record consisting of some twelve hundred pages, there were only three who testified to seeing the Sweazey car just prior to and up to the time of the collision. These witnesses were Faye Sparger, driver of the truck and a defendant in the case, Esther Ridings, and Roy Losee.

The second witness called by respondent was Faye Sparger. The testimony of this witness and the other two witnesses above referred to covers many pages, and we will attempt to set out only the part of the testimony which directly pertains to the collision.

Faye Sparger testified in substance as follows: That he was one of the defendants in the case, and on the day of the accident was proceeding northeasterly along Blue lake, toward Coulee City, with a capacity load of

gasoline; that he had driven oil trucks since the spring of 1937; that he was traveling about twenty-five miles per hour just before and up to the time of the accident; that he saw several cars approaching from the east, but did not pay much attention to the Sweazey car until it made the turn to his side of the road; that when Sparger was about ninety feet from where the collision occurred, the Sweazey car started to cut diagonally across the road; that he had Westinghouse air brakes on his truck and semi-trailer, and that, when he noticed the Sweazey car coming straight toward him, he applied his brakes just for a second before he hit; that he put on the brakes hard enough to make marks on the pavement and to cause his wheels to drag; that the dragging stopped after he was hit, as he was knocked off the brake; that he was on his own side of the highway. Upon further examination, when asked how the accident happened, the witness answered:

"Well, he just—he [referring to the Sweazey car] was coming down the road there and he just swerved over on my side, and it was done so quick that I didn't have time to go either way."

The witness further testified that his truck was on his side of the highway when the accident occurred, and that the Sweazey car was on Sparger's side of the road when the collision occurred. It may be admitted that this witness made conflicting statements relative to the location of his truck and the car at the time of the collision, but he at all times maintained that just before and at the time of the accident he was traveling on his own side of the road at about twenty-five miles per hour, and that the Sweazey car suddenly swerved over and ran into the front of his truck before he could do anything other than apply his brakes.

Esther Ridings testified in substance as follows: That she was a school teacher, residing at Windfield, Kansas; that, just prior to the time of the accident, she was riding in the front seat, on the right-hand side, of a bus which was following the truck; that she noticed the tanker a few miles before and up to the time of the collision, and it was traveling on its right side of the road; that, before the impact, she saw the car which collided with the truck; that the bus was going in a northeasterly direction and approaching a curve, when she noticed two cars approaching from the opposite direction, and it seemed the first car [Sweazey car] was getting pretty well out of the curve coming toward the bus, and that it suddenly swerved to its left in front of the oncoming truck, and collided with it; that, at the time of the accident, the truck was being operated on its own side of the road.

The testimony of this witness further shows that she was looking down the left side of the truck and saw the Sweazey car swerve to the left in front of the truck; that the truck was traveling twenty-five to thirty miles an hour, which was about the speed of the bus; that the bus was about two hundred feet behind the truck; and that the Sweazey car was very close to the truck when it swerved to the left.

It may also be admitted that this witness made some conflicting and contradictory statements about the matters in regard to which she was being interrogated, but she at all times maintained that the truck, just before and at the time of the accident, was on its own side of the road, and not traveling more than twenty-five or thirty miles per hour; that she saw the Sweazey car before the collision, and saw it swerve over and collide with the truck.

We desire next to take up the testimony of Roy Losee, who, at the time of the collision, was sitting in

a boat on Blue lake, facing the highway. Mr. Losee testified in substance as follows: That, at the time of the collision, he was sitting in the front end of the boat, facing the road, and was not fishing; that he saw the truck and the Sweazey car prior to the accident; that he saw the truck about a block down the road before the accident, and it seemed to be kicking up gravel and dirt; that nothing interfered with his vision, and that he saw the collision; that, just prior to the collision, the Sweazey car angled across the road toward the front end of the truck, and the collision occurred; that the truck was going about twenty-five miles per hour, and the car about thirty-five to forty miles per hour; that he did not go to the scene of the accident until some time after it had occurred, as there was quite a crowd around, but that, when he did go up and examine the road, he saw some gouges on the truck's side of the highway; that from where the gouges were on the highway, you could see about two hundred yards.

In regard to the testimony of this witness, counsel for respondent makes the contention that his testimony is so conflicting and contradictory that the jury were not required to believe him, contending specifically that it would have been impossible for the witness to have seen the collision from where he was.

Elenora Strate and Miss Eatwell, two other teachers riding in the bus, also testified. While neither of these witnesses saw the Sweazey car prior to the accident, for the reason that they were not looking in that direction at the time, they both testified that they were following the tanker and were one hundred fifty to two hundred feet behind it; that the truck was traveling on its own side of the road at about twenty-five miles an hour; that they heard the crash and looked,

and that the truck was on its right side of the road at the time of the impact.

Mr. Segar and Mr. Houghton, who were in the boat with Roy Losee, but who were not looking toward the highway at the time of the collision, testified as to what they saw on the highway after the collision, and also testified that, when they heard the crash and looked, there seemed to be dust back of the truck.

Respondent's contention is that the testimony of the disinterested witnesses was conflicting and contradictory, and that the jury was not required to believe it; that it did not overcome the presumption of due care; and that the instructions given by the court were therefore properly given.

It may be conceded that, under the rule laid down by this court, Faye Sparger was an interested witness, and therefore, in passing upon the question presented, we will not consider his testimony.

We have, however, the testimony of Esther Ridings and Roy Losee, two disinterested witnesses, who testified to the action of the Sweazey car prior to and up to the time of the collision.

We are not here concerned with the question of whether or not the trial court was justified in submitting this case to the jury on all the facts (not the presumption), or with the question of whether or not the jury were required to believe the testimony of the witnesses, interested or disinterested; but the only question with which we are concerned is whether or not the presumption of due care was overcome by competent evidence of disinterested witnesses. We cannot agree with respondent that, because the testimony of the disinterested witnesses may have been conflicting or disputed, the presumption was not overcome, for we expressly stated in *Morris v. Chicago, M.*

*St. P. & P. R. Co.,* 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19:

"This presumption, however, being purely a conclusion, and not evidence of anything, it must follow, it seems to us, that, when disinterested witnesses testify as to such actions of the deceased, *even though such testimony may be in conflict or be disputed,* the presumption must disappear. In other words, where there is such testimony, there is no longer any reason for the rule, and to say that, regardless of such testimony, the jury has a right to also consider the presumption, would, in our opinion, be permitting the presumption to be placed in the scale, to be weighed as evidence." (Italics ours.)

Counsel for respondent attempts to distinguish the *Morris* case, contending there was no conflict in the testimony of the disinterested witnesses in the cited case. In our discussion of the conflicting testimony in the *Morris* case, we were not considering whether or not the presumption of due care had been overcome, but whether or not there was such a conflict in the testimony as to entitle the jury to pass upon the question of contributory negligence. In the cited case, we then passed to the question of the presumption, and in considering that question, made the statement above referred to.

Practically all of the cases cited by respondent to sustain his position were cited and discussed in the *Morris* case, *supra,* with the exception of *Luna de la Peunte v. Seattle Times Co.,* 186 Wash. 618, 59 P. (2d) 753, 105 A.. L. R. 932; *Murray v. Kauffman Buick Co.,* 197 Wash. 469, 85 P. (2d) 1061; and *Smith v. Eldridge Motors,* 199 Wash. 10, 90 P. (2d) 257, 93 P. (2d) 1120.

None of the cases last above cited was a death case, where the presumption of due care applied. The *Luna de la Peunte* case was a libel action, and this court stated that it was proper in that case to advise the jury

relative to the presumption of good reputation and good character. In both the *Murray* and *Smith* cases, the presumption referred to was a presumption that the driver of one of the cars concerned in the accident was, at the time of the collision, within the scope of his employment, it having been admitted in each case that the driver was in the employ of, and driving a car owned by, the defendant. In the *Murray* case, no error was based upon the giving of an instruction on the presumption. The error claimed was based upon the granting by the court of a motion for judgment notwithstanding the verdict, and while the court referred to the presumption, we stated:

"Upon the *evidence* contained in the record in the case at bar, it cannot be held as matter of law that respondent was entitled to judgment in its favor. The *evidence* given by respondent's witnesses is, at least to some extent, contradictory, and as to some particulars, Hartbauer's testimony is not entirely consistent with physical facts." (Italics ours.)

In the *Smith* case, we stated:

"The undisputed evidence that appellant owned the car which Ordner was driving, and that Ordner was in its employ, made a *prima facie* case, sufficient, until met by the *testimony of disinterested witnesses,* to carry to the jury the question of fact as to whether or not Ordner was operating the car on appellant's business." (Italics ours.)

While it is difficult to assign a specific reason for the presumption recognized in the different classes of cases, and the decisions do not throw much light on the situation, we think there is a different reason for the presumption in death cases than in a case such as the *Luna de la Peunte* case, *supra,* and the class of cases therein referred to. But, be that as it may, we have consistently held the presumption of due care applicable in death cases is not *evidence,* and disap-

pears from the case upon the introduction of competent disinterested testimony, as stated in the *Morris* case, *supra.*

It should be kept in mind that a presumption is something which the courts have said may be considered in certain cases, under certain conditions, and for certain purposes. We submit that the courts, having brought into being the presumption, may limit the purpose for which it may be considered.

We have consistently recognized, in death cases, that the presumption is not evidence of anything, and relates only to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. The presumption, when the opposite party has produced *prima facie* evidence, has spent its force and served its purpose.

We have consistently held that, where there is disinterested testimony, the presumption disappears and is no longer in the case, and that no instruction on the presumption should be submitted to the jury.

We are not, in the instant case, concerned with a presumption such as was involved in the *Luna de la Peunte* case and cases therein cited, and we do not feel that any further discussion of those cases would serve any purpose herein.

We are satisfied the presumption of due care was overcome by the testimony of the disinterested witnesses in the instant case, and was no longer in the case, and that the court erred in submitting to the jury instructions on the presumption.

We are further of the opinion, for reasons herein assigned, that the trial court properly refused to give appellants' requested instruction upon which assignment of error No. 11 is based.

The basis of assignment of error No. 12 is the giving of the following instruction:

"You are instructed that the maximum speed limit allowed at the place in question was twenty-five miles per hour. If you find from a fair preponderance of the evidence that the defendant's truck was being driven in excess of twenty-five miles per hour, then the defendants would be guilty of negligence."

It will be noticed that this instruction states without qualification that the maximum speed limit at the point of collision was twenty-five miles per hour. It is true that Faye Sparger, driver of the truck, testified that he knew the road was signed at twenty-five miles an hour. However, it does not appear that there was any sign at the point of collision so limiting the speed, or that there were any signs along this highway so limiting the speed, nearer than about one and one-half miles to the southwest, and about the same distance to the northeast.

William S. Long, maintenance supervisor of the state highway department, who had this road under his supervision and had supervision of placing the signs, testified that there was no sign limiting the speed on this highway nearer than one and one-fourth to one and one-half miles from the point of collision; that these signs were only warnings for curves; and that he thought that, at the time of the accident, the signs said thirty-five miles per hour. Mr. Long further testified that this highway was not a restricted highway.

A Mr. Tropple testified for respondent, and exhibited pictures taken by him of the sign about one and one-half miles southwest of the scene of the accident, and views of the highway from the sign to the point of collision, but these pictures did not show other than the one sign.

Under the testimony in this case, we think the court erred in determining as a matter of law that there was a maximum speed limit of twenty-five miles per hour

at the point of collision. The instruction as given, in our opinion, excludes entirely the testimony of Mr. Long, the state highway supervisor of the road in question. We are clearly of the opinion that the instruction should have gone no further than to inform the jury that, if they found, from a preponderance of the evidence, that there was a maximum speed limit of twenty-five miles per hour at the point of collision, and also, from a preponderance of the evidence, found that the driver of the truck was exceeding such maximum speed limit, the defendants would be guilty of negligence. We find nothing in the cases of *Comfort v. Penner,* 166 Wash. 177, 6 P. (2d) 604; *Robinson v. Ebert,* 180 Wash. 387, 39 P. (2d) 992; and *Mathias v. Eichelberger,* 182 Wash. 185, 45 P. (2d) 619, contrary to the views herein expressed.

Assignment of error No. 13 is based upon the court's refusal to give the following instruction proposed by appellants:

"I instruct you that the truck owned and operated by the defendant and the semi-trailer attached thereto at the time of the accident had a right to be lawfully operated upon the highway; that the same did not in weight, height or width exceed the law and that the same was entitled to be operated upon said highway at said time and place at a rate of speed not greater than was reasonable and proper under the conditions existing at said place and at a speed not in excess of thirty-five miles per hour."

This proposed instruction was covered in substance by instructions Nos. 13 and 25, as given by the court, except that no reference was made to a thirty-five mile limit. We find no error in the refusal of the court to give the proposed instruction.

Assignment of error No. 14 is based upon the excessiveness of the verdict and the manifest manner in

which it was arrived at. We do not deem necessary any discussion of the question of whether or not the verdict was excessive.

It is contended that the verdict was arrived at through some quotient method. While some showing was made to the effect that a quotient method was used, we are of the opinion that, in view of the affidavit made by the jurors, this contention was not established. In a case of this character, where general damages are alleged, and in all probability it will be difficult for all the jurors to arrive at an exact amount in the event damages are allowed, it would not be out of place to give a cautionary instruction on a quotient verdict, and thus avoid any possibility of such a verdict being reached.

Assignment of error No. 15 is based upon the misconduct of counsel. If there was any misconduct of counsel, we assume it will not again occur on a retrial of the case.

The judgment is reversed, and the cause remanded with instruction to the superior court to grant a new trial.

BEALS, STEINERT, and DRIVER, JJ., concur.

BLAKE, C. J., dissents.

## ON REHEARING.

[*En Banc.* April 8, 1941.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein.

BLAKE, J. (dissenting)—Before the rule laid down in the case of *Morris v. Chicago, M., St. P. & P. R. Co.,* 1 Wn. (2d) 587, 97 P. (2d) 119, 100 P. (2d) 19, may be said to have become *stare decisis,* I am impelled to say again that I fail to see why it is error to give an

instruction upon due care in a death case when it is not error to instruct that a person injured at a railroad crossing was presumed to have exercised due care—to have stopped, looked, and listened, *Steele v. Northern Pac. R. Co.,* 21 Wash. 287, 57 Pac. 820; when it is error to fail to give an instruction on the presumption of innocence in a murder trial when the homicide is admitted, *State v. Tyree,* 143 Wash. 313, 255 Pac. 382; when it is proper to instruct that the presumption of innocence attends a defendant *until overcome by the evidence* (*State v. Pavelich,* 153 Wash. 379, 279 Pac. 1102) and guilt is proved beyond a reasonable doubt, *State v. Dunn,* 159 Wash. 608, 294 Pac. 217; when, in a fraud case, it is proper to instruct that the presumption of honesty and fair dealing must be rebutted by evidence clear, cogent, and convincing, *Biel v. Tolsma,* 94 Wash. 104, 161 Pac. 1047; when it is proper, in a libel case, to instruct that the reputation of plaintiff is presumed to be good in face of positive evidence that it is bad, *Luna de la Peunte v. Seattle Times Co.,* 186 Wash. 618, 59 P. (2d) 753, 105 A. L. R. 932; when it is necessary, in a case against parents for alienation of affections of their son, to instruct that it is presumed that the parents acted in good faith in advising and counselling the son concerning his domestic affairs, *Cramer v. Cramer,* 106 Wash. 681, 180 Pac. 915. In the case last cited, the court said:

"It is not enough to advise the jury simply that their belief in the good faith of the parents is sufficient to warrant a verdict in their favor. When requested, the jury should be directed how to proceed in determining their good faith or lack of it. *If there is a presumption in favor of good faith carrying its companion of a burden imposed upon him who assails it—and there is—it is important the jury should be so instructed. The appellants had a right to a direct and positive instruction upon this matter.*" (Italics mine.)

The court then quoted with approval from the case of *Cornelius v. Cornelius,* 233 Mo. 1, 38, 135 S. W. 65, as follows:

" 'If defendant was entitled to the presumption of good faith, as he was, its existence should not have been left to be *felt out* and inferred by way of implication and argument by the jury, but it should have been boldly and plainly declared.' "

It seems to me that there is far less justification for instructing the jury upon the presumptions in the foregoing instances than there is in such a case as this—where the lips of the one to whom the presumption is accorded are sealed in death.

I dissent.

MAIN and MILLARD, JJ., concur with BLAKE, J.