[Crim. No. 5939.   In Bank.   Apr. 12, 1957.]

THE PEOPLE Respondent, v. DAVID J. HARDEN-BROOK, Appellant.

Russell Yeager, Public Defender (Imperial County), for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

CARTER, J.—This is an automatic appeal from a judgment imposing the death penalty after a jury verdict finding the defendant guilty of first degree murder and fixing the penalty as death. Defendant was found sane by a jury after trial on his plea of not guilty by reason of insanity. The record does not disclose that a motion for a new trial was made by or on behalf of defendant.

Defendant, David J. Hardenbrook, was the adopted son of the victim of the homicide, Mrs. Eleanor Hardenbrook. Defendant admitted both prior to and during the trial that he shot his adoptive mother through the back of the head while he was visiting her at her home on Saturday, March 17, 1956. The major question involved concerns the degree of the crime—whether the evidence is sufficient to sustain a finding of murder in the first degree or whether it shows only second degree homicide. The admissibility of certain evidence from which the jury could have inferred that the crime was premeditated is questioned as being erroneous and prejudicial.

On Thursday, March 15, 1956, defendant borrowed a .22 caliber automatic pistol with the avowed purpose of using it for target practice. Scott, a witness for the People, testified that he saw the defendant on the night of March 15th, at the Tropics Bar and Café in Imperial at about 8 o'clock in the evening and that defendant was showing a .22 automatic pistol to some people sitting at the bar and that defendant said the gun was his. Scott testified that he, the defendant and three other persons left the café and bar after about an hour and went to Brawley; that defendant wanted to stop at his mother's house; that they stopped and defendant went in, had something to eat, came back out and they all proceeded to another bar just outside of Brawley. During this time the gun was in the back of Scott's car. After going to another bar Scott drove defendant back to the El Centro Hotel where he was living; defendant was "pretty sickening drunk" and left the gun in Scott's car.

On Friday, March 16th, Scott saw defendant leaving the Post parking lot on the outside of the naval air station base and stopped his car so that defendant could get in. Scott and defendant then drove to El Centro where Scott bought some bullets for the gun so that they could do some target practicing. They drove towards Imperial and then to a place called New River where they did some target shooting. Out of a box of 50 shells, nine were left and defendant wanted to save them. During the target shooting defendant asked Scott

if he knew where a silencer could be bought and what it would cost. On their way back defendant said someone at the gate wanted a ride back into town and when they came back out again they picked up the hitchhiker, Potter, and went into town. At this time it was about dusk and around 7 o'clock. When defendant got out of the car at El Centro he took the gun out of the glove compartment and got a paper bag into which to put it. During the ride into El Centro the matter of a silencer was again discussed.

Potter, who was sitting in the back of the car during the ride into El Centro, testified that Scott, who was driving, looked "over to Hardenbrook and he said, 'Where are you going to kill your mother?' So Hardenbrook looked over at Scott and he says, 'In the bedroom, I guess.' They got to talking about how much a silencer cost, or where he could get one, and Scott said he didn't have any idea what they cost or where to get one." Potter testified that later that night when he got back to the base he stopped over where he worked and told the story to a "guy named Hum." This portion of Potter's testimony was denied by both defendant and Scott.

Defendant testified that he had been adopted by the·deceased when he was about 2 months old; that he had lived with her up until "fairly recently" when he had moved to the El Centro Hotel where he lived alone. He testified to borrowing the gun and showing it to several people at the Tropics bar; to the target shooting and to discussing the matter of a silencer for the gun but said that he asked about it just out of curiosity. He told how he and Scott picked up Potter and gave him a ride into town. He testified that after he got out of the car with the gun he went into a grocery store and got a paper bag in which to carry the gun; that he then went back to the El Centro Hotel and "put up the gun" and hitchhiked from there to Brawley and went to his mother's home where he had dinner with her after which they listened to the radio and played canasta; that he then hitchhiked back to El Centro to his hotel. He said he did not take the gun with him on Friday night when he went to his mother's home. He testified that his mother told him that if he would come back in the morning she would launder his clothes for him; that he got up around 9:30 on the morning of Saturday, the 17th, and hitchhiked from El Centro to Brawley taking the laundry and the gun with him. He said that he took the gun with him so that he could clean it before returning it; that when he arrived at his mother's home he put the alumi-

num box containing his clothes and the gun on a table; that he waited until his mother was out of the room and then took the gun out of the box and put it between two pillows on the couch because his "mother doesn't approve of firearms of any type." After hiding the gun, defendant testified that he ate breakfast and sat around looking at books and listening to the Metropolitan opera on the radio and that "after my clothes had gone through the laundry, she brought them back in and was starching them, and I went over to the couch and reached under the pillow and got the gun and went back to the chair and shot her" in the back of the neck; that he didn't know why he did it; that "it just happened"; that he hadn't thought about killing his mother; that they had not had any harsh words at any time; that when he saw his mother fall down he realized what he had done; that he dragged the body from the kitchen to the bedroom. After that he testified that he tried to forge his mother's name to a check but was so nervous he spoiled the first one, but then wrote one for $75 payable to himself by forging his mother's name; that he took two of her small suitcases and her car keys from her bedroom dresser; went out and got his mother's car and drove to Brawley and cashed the check; that he then had gas put in the car and drove out to the base where he talked with Scott; that he then drove out to Seal Beach where he stayed overnight with some friends; that he and the friends went to the beach the next day; that he drove them to their home and went to a motel where he stayed overnight; that the next morning after reading about the crime in a newspaper, he went to a priest and confessed what he had done; that the priest called the police. On cross-examination defendant admitted that he had given his mother a great deal of trouble over money and the car and that she had suggested that he move out of her home and "go out on my own." Mrs. Hardenbrook's body was found by her landlord on March 18th.

Over objection by defense counsel, Patrick Hum testified that Potter had told him on the night of the 16th of the conversation he had overheard between Scott and the defendant as to the "planning" of killing "someone's mother." At the time the court admitted this testimony, the jury was admonished as follows: "Ladies and gentlemen of the jury, I wish to advise you at this time in reference to that—this answer by the witness is being admitted for a limited purpose only. As you know, testimony has been given here by one of the witnesses that when he was in the car with the defendant, there was certain conversation in regard to the shooting of

one's mother. The defendant, when he took the stand, stated there was no such conversation. Now, then this answer is being allowed to go in not for the purpose of proving the truth of that conversation, but to prove, if it proves to you, for your consideration, to show that at the time prior to the commission of the offense that the witness whose word was contradicted, made a statement as to the conversation to third parties and therefore it could indicate he didn't fabricate the story after the commission of the offense. Now, do you know what I mean?'' The record shows that the jury indicated its understanding in the affirmative.

It is contended by defendant that the trial court committed prejudicial error in permitting the witness Hum to testify concerning the conversation Potter had repeated to him on the night prior to the commission of the crime. ■ "It is the rule generally and in this state that where the opposition has assailed the testimony of a witness as being of recent fabrication, an exception to the hearsay rule allows the admission of evidence of statements or conduct prior to the claimed fabrication and consistent with the testimony of the witness at the trial, 'not to prove the facts of the case, but as tending to show that the witness has not been controlled by motives of interest and that he has not fabricated something for the purpose of the case.' (*People* v. *Kynette,* 15 Cal.2d 731, 753-754 [104 P.2d 794]; see also *Sweazey* v. *Valley Transport, Inc.,* 6 Wn.2d 324 [106 P.2d 567, 111 P.2d 1010, 140 A.L.R. 1]; 140 A.L.R. 93.)'' (*People* v. *Walsh,* 47 Cal.2d 36, 41 [301 P.2d 247].) ■ It is apparent that the court did not err in permitting the witness Hum to testify since the jury was clearly informed that such testimony was admitted only for the limited purpose set forth in the decided cases as an exception to the hearsay rule. (See also *People* v. *Doetschman,* 69 Cal.App.2d 486, 491-492 [159 P.2d 418]; *Bickford* v. *Mauser,* 53 Cal.App.2d 680, 686-687 [128 P.2d 79]; *Davis* v. *Tanner,* 88 Cal.App. 67, 76-77 [262 P. 1106].)

■ Defendant contends that the trial court committed prejudicial error in refusing to permit him to offer testimony of a ''foster-aunt'' (sister of the victim) to the effect that he was incapable of premeditation. The court ruled that the witness could testify to ''certain facts in connection with certain things that have happened in the past for the limited purpose of the jury considering such evidence for whatever value it may have, if any, in considering whether this individual has the power of mind to premeditate'' but that not being

an expert the witness could not testify as to any opinion held by her as to defendant's ability to premeditate nor could she testify to acts and occurrences occurring during the time before defendant was 14 years of age. (It was admitted by counsel that at the time of the crime defendant was 20 years of age and that at the time of trial he was 21 years of age.) After the court's ruling, defense counsel said: "I am sorry for taking so much time, we might as well forget about it. It is too general under your ruling, Judge." No effort was made by defendant to call the witness for testimony concerning conduct on the part of defendant during the seven years preceding the trial. Under the circumstances shown by the record it appears that the court did not err in excluding opinion evidence given by a lay person. In *People* v. *Wells,* 33 Cal.2d 330, 345 [202 P.2d 53], medical evidence of the defendant's state of mind was held to have been improperly excluded at the trial of the general issue. In the case at bar, the defense offered no medical testimony concerning the defendant's ability to form an intent to commit a crime although the defendant was permitted to testify that he usually acted on "impulse" and that he had spent some time in Camarillo State Hospital. ■ There also appears to have been no error in the trial court's refusal to permit the lay witness to testify concerning defendant's conduct more than seven years prior to the time of trial since such testimony would be too remote in point of time to be of much aid to the jury.

■ The defendant contends that the district attorney committed prejudicial error in numerous instances during his argument to the jury. It is argued that the district attorney's references to the defendant as a "mother-killer" and "sneaky" mother-killer were intended to instill passion and prejudice against the defendant in the minds of the jurors; that the reference to the victim as the "mother" of the defendant had no basis in the record in that she was only his "foster-mother." It is also argued that the district attorney's references to defendant as never working and having no money and as being "no good" had no foundation in the record. Insofar as the references to the deceased as the defendant's mother are concerned, the record shows that the defendant considered her his mother and that she had acted toward him as if he were her natural son from the time he was 2 months of age. The record also shows that defendant at all times admitted having killed his "mother." The record shows that defendant had no money with the exception of perhaps a

dollar on the night before he committed the crime; that he had worked once in a while but not at one job for any length of time. These arguments therefore appear to be without merit.

█ Error is also predicated on the district attorney's argument to the jury concerning murder perpetrated in the commission of a robbery and by lying in wait. The record shows that the district attorney argued that the murder was of the first degree in that it was premeditated on the part of the defendant, or committed by him when lying in wait, or in the course of a robbery. The trial court refused an instruction on ''lying-in-wait'' and no instruction was given on the theory .that murder committed during a robbery was first degree murder other than a mere statement to that effect. The jury was fully and fairly instructed concerning both murder of the first and second degree, as well as manslaughter, and the jury was admonished that its duty was to follow the law as stated to it by the court. The jury was also told that it was to be governed solely by the evidence introduced at the trial ''and the law as stated to you by me''; that any instruction inapplicable to the facts as found by it was to be disregarded; that any statements made by counsel were not to be taken as evidence in the case. Under the circumstances it would appear that defendant suffered no prejudice from the remarks of the prosecution in its arguments when the evidence concerning defendant's conduct in his mother's home was commented upon as well as the comments upon the evidence as it related to defendant's taking of the deceased's car and traveling bags. These facts were in evidence and any comments by the prosecution concerning theories of the law inapplicable thereto could not have been considered by the jury in view of the admonition of the trial judge since it must be presumed that the jury followed the law as given to it by the court.

█ Defendant argues that the People committed prejudicial error in arguing to the jury that they need not all agree on the same theory of first degree murder if they agreed that defendant was guilty of first degree murder. In *People* v. *Chavez,* 37 Cal.2d 656, 671, 672 [234 P.2d 632], where the same question was first raised in this court, we held '' '. . . It was not necessary to require the jury to agree upon the theory. If, under any one of the theories set forth, they believed appellant had gained possession of and appropriated to his own use the moneys of Pacific, he was guilty of grand theft.' [Quotation from *People* v. *Caldwell,* 55 Cal.App.2d

238, 255, 256 [130 P.2d 495].] The same rule is applicable to the various grounds upon which the jury could have found Chavez guilty of murder in the first degree.''

■ Defendant also contends that the People committed prejudicial error in that the evidence was misquoted. It is argued that the prosecuting attorney argued to the jury that a witness, Heise, had testified to seeing the gun in defendant's possession on two different occasions prior to the commission of the crime. Defendant's argument is that the witness Heise saw the gun only once on the Thursday preceding the homicide. The record shows that Heise testified that he saw the gun on Thursday at the Waikiki Bar and that it was in a box inside a paper bag and that it was unloaded. He also testified that he saw defendant the following evening at the Waikiki again and that he had the same paper sack with him; that the witness asked defendant if he were still carrying ''that'' around with him and that defendant said ''yes''; that defendant, on the second occasion, showed him the clip he had for the gun and that it had shells in it. The prosecuting attorney pointed out to the jury that on the second occasion Heise didn't see the gun but that he did see the paper bag and the clip with the shells in it. In his closing argument the prosecuting attorney argued to the jury that Heise saw the gun twice—once on Friday night. No objection was interposed by defense counsel and, in view of the evidence and the other correct references by the prosecution to the testimony of Heise it is difficult to see how any prejudice could have resulted to defendant from what was obviously a slip of the tongue. Further, the jury was instructed that the statements and arguments of counsel were not evidence in the case and, if contrary to the evidence, should be disregarded.

A reading of the prosecution's arguments to the jury disproves defendant's contention that an appeal was made to the jury in order to arouse passion and prejudice against the defendant, and that the prosecution argued its personal belief as to defendant's guilt. The remarks made did not exceed the bounds of fair comment on the evidence and the so-called ''personal belief'' remarks were pleas to the jury to bring in a first degree verdict. ■ It should also be noted that defense counsel made no objection during the arguments. ''If appellant deemed that any harmful effect might attach to the statement in question, he should have made timely objection at the trial so that any misunderstanding could have been clarified by a proper instruction to the jury.'' (*People* v. *Amaya*, 40 Cal.2d 70, 79 [251 P.2d 324].)

There was substantial evidence in support of the jury's determination and its finding will not be disturbed. (*People* v. *Smith,* 15 Cal.2d 640, 648 [104 P.2d 510] ; *People* v. *Amaya,* 40 Cal.2d 70, 81 [251 P.2d 324].)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., Spence, J., and McComb, J., concurred.