STATE OF MONTANA, RESPONDENT, *v.* LONG, APPELLANT.

No. 9284.

Submitted October 6, 1953. Decided March 26, 1954.

Mr. Justices Angstman and Anderson dissented.

Malcolm MacCalman, Deer Lodge, for appellant.

Arnold H. Olsen, Atty. Gen., Hubert J. Massman, Asst. Atty. Gen., H. Moody Brickett, Asst. Atty. Gen., John M. Dietrich, Jr. (Special Counsel, Deer Lodge), for respondent.

Mr. MacCalman, Mr. Massman and Mr. Dietrich argued orally.

MR. JUSTICE FREEBOURN:

Upon conviction by a jury of the crime of rape, Edward Long, defendant and appellant, was sentenced to serve 20 years in the state prison.

. From the judgment of conviction and denial of a motion for a new trial the defendant appeals.

. On June 30, 1952, the defendant was one of a number of trusties doing ranch work and staying without guard on one of the leased ranches operated by the state in connection with the state prison and located about a mile from Garrison, Montana. He turned up on the evening of that day at Swede's Place, a tavern at Garrison, wearing as part of his garb a white shirt and overalls. Here he inquired of one of the tavern customers, Everett Stake, an apparent stranger, where Joe Chavez (prosecutrix' husband) lived, and when told, he asked Stake "to take him down there," the Chavez home being about two blocks from Swede's Place.

Stake drove defendant to the Chavez home and stopped his car "about 10 or 15 feet" from the door, where defendant got out, "went to the door and knocked and the light came on. He talked for a few seconds and then he came out and told me [Stake] that he was going to stay and that I could go on back."

Stake could see some person answer the door of the Chavez home when defendant knocked, but he "couldn't tell for sure who it was." Stake then returned to Swede's Place where sometime later he again saw defendant, at which time there was nothing unusual about defendant's appearance; "he wasn't messed up or drunk" and "was just as calm as he was when I took him down there."

The sheriff who picked up the defendant on the day following did not "observe any cuts or bruises or other lacerations about his face and hands."

The transcript is filled with leading questions asked and hearsay evidence elicited by the prosecution. Like multiplying rabbits such questions and answers increased as the trial proceeded until, like the stars in the heavens, they are almost countless. Then too, like oases in the desert, objections thereto were few and far between.

The testimony of the state's witness Stake, concerning what occurred at the Chavez home after defendant left the car, varies greatly from that of the prosecutrix, Mrs. Chavez, on direct examination, as to what took place when defendant came to her door. She testified she was asleep and heard a rattle on the outside door; "* * * I never answered the door at all and he walked into the shed * * * and he rapped on the inside door * * * The kitchen door * * * so I got up and * * * turned on the light * * * I opened the door * * * then he came in and came at me and threw me on the kitchen floor * * * Q. What happened immediately after you opened the door and saw this man * * *? A. * * * he got hold of me and threw me on the kitchen floor * * * I struggled away from him * * * and went outside * * *. I just got outside the door and he grabbed me again and threw me on the ground * * * he said, 'I am going to kill you' * * *". Again when asked if there was any other conversation in the house or out in the yard, she answered, "not to my knowledge."

Her testimony on cross-examination was in no measure different from that on direct examination. Significantly, however, on re-direct examination she gave the following answer to the following leading question: "Q. Mrs. Chavez, when the defendant, Mr. Long, came to your door, and you turned on the light and went to the door, did he or did he not remain for a few seconds and then go to an automobile that was outside of your house—if you know? * * * A. Yes, he did."

The "did he or did he not" or "if you know" did not relieve the question of its highly prejudicial quality for it was designed

to and it did put the words of the answer in the mouth of the witness with as strong effect on the jury as if the witness had uttered such words herself, instead of having been coined by the county attorney.

She testified: "Q. Did he make any statement to you that would indicate that he intended to rape you? A. No, he didn't. * * * Q. Did he make any other statement to you that you now recall? A. Not that I remember."

Defendant's timely objection thereto being overruled, the county attorney put the following leading question, to which the prosecutrix made the following answer: "Q. Did the defendant, Mr. Long, when he had you down, make any statement concerning that he was going to get what he came after? A. He said he was going to if it took all day or all night."

It was error to overrule defendant's objection to such leading question and to allow the witness to answer the same.

Her testimony further shows:

"Q. Did the defendant actually engage—did the defendant on that evening, at that time, in front of your house, did he actually engage in an act of sexual intercourse with you? A. He did.

"Q. He actually engaged in such act? A. Yes.

"Q. Did his private part penetrate your body? A. It did.

"Q. Was there only—how many occurrences of that were there? A. One.

"Q. Just one? A. Yes."

The prosecutrix also testified that the defendant, after he "had completed his act, * * * he just got up and took off * * * down the road."

Although her husband, Joe Chavez, was working at a railroad coal hoist but "three tracks over" from the Chavez home, "not very far away," the prosecutrix neither went to him nor "right next door" to her neighbor, Mrs. Patten, whose home was but 15 feet from the Chavez home, to make complaint. Seeming to take things in stride, after defendant "went down the road," she, according to her testimony, "went in the house * * * got

some hot water and washed \* \* \* all off and \* \* \* laid down on the bed.''

When Joe Chavez came home at 5:30 in the morning, she said she told him ''some man broke into my place and beat me up.'' According to Joe, she said, ''Some guy come up and try to kill me.'' She testified: ''Q. Did you make any statement to Joe at that time that you had been raped? A. No, I did not. Q. You didn't tell him? A. No.''

No explanation is made as to why she failed to disclose to her husband what had actually occurred, or why she concealed from him the fact that she had been raped, if such was the fact, other than that given by Joe Chavez, who testified: ''She didn't want to tell me about it right away 'cause she was scared. Q. She was scared? A. That's right.''

There is no evidence in the record, other than the word of the prosecutrix, that she had been raped. This fact, plus her failure to tell her husband that she had been raped, and the inconsistencies in her testimony, must have caused the prosecution to feel the state's case was a weak one, for much of the evidence consists of showing that hours after the alleged rape is claimed to have been committed, the prosecutrix told other witnesses she had been raped. These statements, made to and repeated by the witnesses upon the witness stand, were incompetent as evidence. They were pure hearsay for they were neither made in the presence of the defendant nor were they admissible as part of the res gestae.

The doctor who treated Mrs. Chavez for bruises the day following the alleged rape testified: ''Q. Did she make any statement to you relative to whether or not she had been raped? \* \* \* A. She stated that she had been raped.'' On cross-examination he said: ''A. I did not examine her vaginally—I had no particular reason to.''

The sheriff testified:

''Q. Did she tell you what had happened to her the early morning of that day? A. Yes, she did.

"Q. What did she tell you?

"Mr. MacCalman: Objection—hearsay.

"Mr. Dietrich: * * * I feel, your Honor, that under the circumstances Mrs. Chavez has the right to have someone testify that she made a charge that she had been raped * * *.

"The Court: Overruled."

The sheriff was then permitted to testify: "* * * I can't say if she told me outside right away that she had been raped or whether I asked her and then she told me, but anyway I got the information right there. * * * Q. Did she state to you that she had, in fact, been raped? A. Yes."

The objection should have been sustained, and it was error not to do so.

The effect of such evidence was to back up an unconvincing witness with the testimony of witnesses, prominent in the life of the community and undoubtedly, personally known to the members of the jury. To the members of the jury not versed in the law of evidence, the testimony had the same effect as though the relating witnesses had been present and seen an act of rape committed upon the prosecutrix.

The direct testimony of Mrs. Nordgulen, a neighbor of the Chavezes, called by the prosecution, shows not that the prosecutrix, as she testified, had been raped in the yard, but: "Q. Did Mrs. Chavez make any statement to you, Mrs. Nordgulen, relative to whether or not she had been raped that early morning? A. She said that a man had tried to rape her—that he came in the house and tried to rape her and he had beaten her you know, in the bedroom—that is what she said. Q. Did she say at any time that she had not been raped—did she ever say positively to you that she had not been raped? A. No, she said that a man had tried to rape her."

The affidavit of the county attorney, dated September 29, 1952, filed in support of his motion to file the information herein reads in part: "That affiant * * * talked with Mrs. Joe Chavez and made an individual investigation of the facts and circum-

stances surrounding the said assault. That such inquiry resulted in the discovery of the following facts: That on the evening of June 30, 1952 * * * defendant, Edward Long, threw Mrs. Chavez to the floor and engaged in an act of sexual intercourse against the will and without the consent of Mrs. Joe Chavez * * *".

So it would seem that Mrs. Chavez, prior to the filing of the information, told the county attorney the rape occurred in the house, and not in the yard as she testified on the witness stand. It would also appear that the information secured by the county attorney from Mrs. Chavez indicated the defendant was at the Chavez home on the evening of June 30, 1952, as defendant said, and not after 1:00 a. m. of July 1, 1952, after Joe Chavez had gone back to the coal dock.

The prosecutrix testified that when her husband Joe came home for lunch at 12:00 o'clock: "Joe and I went down [to Swede's Place] and got some beer." Joe Chavez testified: "I said to her [prosecutrix] I get a couple of quarts of beer and bring them home from the joint * * *".

The sheriff testified that he talked to the bartender, T. E. McCarthy, and "at that time, while I was talking to the bartender, he mentioned that he saw Mr. Chavez come in and buy a couple of bottles of beer." McCarthy did not take the witness stand.

Mrs. Chavez testified she and her husband went to the Nordgulen home "in the car." Joe Chavez said they walked over.

Defendant testified he had known the Chavezes for about ten months and had traded $15 worth of prison groceries to them "for a $2.65 gallon jug of wine," and that they owed him a fifth of wine which he went after and obtained on the night in question. He said he was there about ten minutes and had returned to Swede's Place by 11:30 o'clock, stopping at Al Curry's house, next to Swede's Place, after leaving the Chavez home. Al Curry was not called by the prosecution or the defendant.

Defendant denied committing the crime charged and said Mrs. Chavez appeared all right when he last saw her. Defendant was

53 years of age and the prosecutrix, although the record does not show her age in years, would appear to be a woman of middle age who made intelligent answers to questions asked her.

The record as one scans it causes the reader to wonder what the true facts of this case were, for not only did the prosecutrix fail to tell her husband that she had been raped when he came home from work, but she failed to give him a description of her supposed assailant. The testimony of Joe Chavez shows: "Yes, I ask her where he went and what kind of looking guy was he —she didn't tell me nothing right then * * *". Again why should she be afraid to tell her husband the truth, if it was the truth, that she had been raped, for if her testimony be true it was no fault of hers. Joe testified: "She didn't want to tell me about it right away cause she was scared. Q. She was scared? A. That's right." Scared of whom? Not of the defendant, for he had long since "took off and went down the road." Was she afraid of Joe, and why? Joe was at the coal dock "three tracks over," and when asked, "Can you see your house from the coal dock?" his answer was, "Sure." Did Joe see Stake's car, with lights on, drive up to his house and a man get out of the car and go in the house? If Joe did see things happening at his home, and such happenings took place before 11:30 as defendant testified, what was Joe's reaction when he arrived home at 12:00 o'clock?

Defendant offered instruction No. 0, which was refused over defendant's objection. It contained in part the following admonishment to the jury: "You are instructed that you have no right to disregard the testimony of the defendant solely on the ground that he is the defendant and stands charged with the commission of a crime." This part of the instruction was given in no other instruction read to the jury. Instruction No. 0 should have been given and it was error not to do so. This instruction, especially that part quoted, was particularly appropriate here, and the jury needed such cautionary instruction because from the evidence it appeared that defendant not only

had been convicted of a felony, but was at the time of the alleged offense and trial serving time in the state's prison.

Whatever the status of a defendant in a criminal case may be and whatever be the nature of the crime with which he is charged, each and all are entitled to the same fair trial guaranteed by our Constitution. The Constitution makes no distinction between defendants but treats all alike, as must this court, whose duty it is to see that defendants in criminal cases brought before us are accorded a fair trial.

No jury has the right, even though a defendant be a convicted and imprisoned felon, to disregard and cast aside the testimony of a defendant simply because he be an imprisoned felon. Every defendant who testifies has the right to have the jury before which he is brought weigh his testimony and determine whether it is entitled to credibility or not so entitled.

This weighing and consideration by the jury may be a hard thing to give where the defendant, as here, appears under such unfavorable circumstances, almost as one might say "without a ghost of a chance." Hence the necessity for such instruction.

For the reasons stated the judgment of conviction is reversed and the cause is remanded to the district court for a new trial.

MR. JUSTICE BOTTOMLY concurs.

MR. CHIEF JUSTICE ADAIR: (specially concurring).

I concur in the result but not in all that is said in the foregoing opinion. It is clear to me that the accused was not accorded a fair trial to which he was and is entitled under our Constitution, and his court appointed attorney is to be commended for bringing this appeal to our attention.

MR. JUSTICE ANGSTMAN, (dissenting).

I am not able to agree with the majority opinion so far as it holds that it was error to receive evidence that prosecutrix told the sheriff that she had been raped.

The prosecuting witness had previously testified that she told others that she had been raped. On her cross-examination there

532

was an attempt made to discredit her statements on this subject. The testimony elicited from the sheriff was to corroborate that given by prosecutrix relative to the fact that she made complaint soon after the rape was committed, and all the courts hold that such evidence is admissible.

The rule is stated in 44 Am. Jur., Rape, sec. 82, p. 952, as follows: "In criminal trials for rape and assault with intent to ravish, the courts are unanimous in holding that it may be shown by the testimony of the prosecuting witness, or that of other witnesses, that the prosecutrix made complaint of the outrage soon after its commission, for the purpose of corroborating the testimony of the prosecutrix, but not as independent evidence of the offense charged, unless made in extremis." And see to the same effect the note in 140 A. L. R. 174; People v. Nobles, 44 Cal. App. (2d) 422, 112 Pac. (2d) 651; Sweazey v. Valley Transport, 6 Wash. (2d) 324, 107 Pac. (2d) 567, 111 Pac. (2d) 1010, 140 A. L. R. 1; State v. Murley, 35 Wash. (2d) 233, 212 Pac. (2d) 801; Affronti v. United States, 8 Cir., 145 F. (2d) 3.

It is going far afield to say, as stated in the majority opinion, that such evidence had the same effect upon the jury as if the sheriff had been present and had seen the act of rape committed upon the prosecutrix. This statement is an unwarranted reflection upon the intelligence of the jury.

Neither do I agree that it was error to refuse to give that part of defendant's offered instruction No. 0 reading: "You are instructed that you have no right to disregard the testimony of the defendant solely on the ground that he is the defendant and stands charged with the commission of a crime."

In the first place defendant has not assigned this as error. He makes no contention in his brief that error was committed in refusing this instruction. But the point is not well taken on its merits. More than 50 years ago this court passed upon this identical question and reached a conclusion contrary to that now proclaimed by the majority opinion. In State v. McClellan, 23 Mont. 532, 59 Pac. 924, 926, 75 Am. St. Rep. 558, this court said: "The court refused to charge that the jury had no right to

disregard the testimony of the defendants merely because they were the defendants, and stood charged with the commission of a crime; and, furthermore, that the defendants' testimony should be fairly and impartially considered, together with all the other evidence in the case. There was no error in the refusal of the court to give this instruction, for the court charged that the defendant in a criminal action may testify in his own behalf, and that the jury, in judging of his credibility and the weight to be given his testimony, should take into consideration the fact that he is the defendant, and the nature and enormity of the crime of which he is accused. There was also a general charge that a witness is presumed to speak the truth, but that this presumption might be repelled by the manner in which he testifies, by the character of his testimony, or by evidence affecting his character for truth, honesty, or integrity, or his motives, or by contradictory evidence, and that the jury were the exclusive judges of his credibility. We hold that this was sufficient, and that there was no error in refusing the instruction requested.''

Here, as in the McClellan case, the court instructed the jury that a defendant may testify in his own behalf and that the jury in judging of his credibility and the weight to be given to his testimony may take into consideration the fact that he is the defendant and the nature and enormity of the crime of which he is accused. There was also the stock instruction that a witness is presumed to speak the truth but that this presumption might be repelled by the manner in which he testifies, by the character of his testimony or by evidence affecting his character for truth, honesty or integrity or his motives or by contradictory evidence and that the jury were the exclusive judges of his credibility.

This case is an exact parallel to the McClellan case, and if we are now to change the rule that case should be expressly overruled. I think the McClellan case is proper and that no error was committed in refusing to give offered instruction No. 0.

I do not find in the record any objection to the question asked of Mrs. Chavez as to whether defendant made any statement to her that would indicate that he intended to get what he came

after. The record shows that after the question was answered an objection was made. No motion was made to have the answer stricken, but the witness was later asked, "Would you relate to the jury what the defendant said?" The answer which came without objection was this: "When he got me down, he said that he was going to get what he was after—he said that he was going to get what he was after if it took him all day to do it." The latter question was not leading nor was there any objection made to the question. I think we should not place the trial court in error when no adverse ruling was made.

These seem to be the only points upon which the majority opinion bases its grounds for reversal. It is true that the majority opinion also makes a studied attempt to discredit some of the testimony of the prosecutrix. But I do not understand that it holds evidence is insufficient to sustain the verdict. verdict.

Our province on the appeal so far as the sufficiency of the evidence is concerned is to ascertain whether there is credible evidence sufficient to sustain the verdict. It is of no consequence to us that the evidence may be conflicting or that some of it may not appear trustworthy. I have no difficulty in finding in the record substantial credible evidence upholding the jury's verdict. The problem of weighing the evidence when conflicting was one for the jury and not for this court. I think the judgment should be affirmed.

MR. JUSTICE ANDERSON:

I concur in the foregoing dissenting opinion of MR. JUSTICE ANGSTMAN.